Argued and submitted November 12, 1999, affirmed May 9, 2001

In the Matter of
Joshua J. Newell, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF JACKSON COUNTY,
*Respondent,*

*v.*

Joshua J. NEWELL,
*Appellant.*

97-0585-C3; A105283

25 P3d 382

Robert M. Stone argued the cause and filed the brief for appellant.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Youth appeals from a juvenile court order that committed him to the custody of the Oregon Youth Authority (OYA). He makes three assignments of error. He contends, first, that the trial court erred by denying his motion to suppress statements that he contends were made involuntarily; second, that it erred by committing him to OYA custody for a period of time greater than the maximum period for which he could have been sentenced as an adult; and third, that it erred by imposing consecutive periods of OYA custody totaling six years. We affirm.

Youth was 16 years old on January 23, 1997, when his infant son was hospitalized for head injuries. Police first interviewed youth at the hospital about his son's injuries. The officers who conducted the interview, detectives Skinner and Chuck Newell,[1] were in plain clothes. Youth was neither under arrest nor physically restrained. Skinner told youth that, if he were responsible for his son's injuries, the decision whether to arrest and prosecute him would be made by the District Attorney's office. Skinner reiterated that statement in later interviews. Skinner told youth that he had on occasion treated his own children "too rough[ly]" and asked if youth had accidently dropped his son. Youth denied any responsibility for his son's injuries. Youth also said that he felt affected by stress from the extended time that his son had spent in hospitals, referring to hospitalizations that resulted from injuries that his son had suffered at birth.

The detectives conducted a second interview of youth on January 31 at youth's home, with youth's mother present. The detectives were again in plain clothes. During that interview, youth described bumping his son's head accidently into a cement wall while carrying him. Youth did not mention any intention to harm his son.

The police subsequently conducted a polygraph examination of youth at the police station. Youth's mother

---

[1] Three individuals in this case have Newell as their last name. We use their first names where necessary to avoid confusion.

signed a permission slip for youth to participate in the examination, and youth took that form to school on the day of the examination. The police picked youth up from school and took him to the police station. At the station, Detective Phillips gave youth an "Oregon State Polygraph Information Sheet." That form states that the person to be examined has a right not to take the polygraph examination, that anything said during the examination can be used in court, and that the person can stop the examination at any time. Youth signed the form after Phillips read it to him. Phillips also gave youth *Miranda* warnings before the examination. Youth signed an "Advice of Rights" form stating that he had received and understood those warnings. Phillips testified that he went over both forms with youth and that youth said that he understood his rights before he signed the forms.

Phillips asked youth in pretest questioning if youth thought that anger management classes would help someone who injured an infant. Youth answered that he thought that they would. At trial, Phillips denied offering youth any inducement to make any admissions. Phillips told youth that he seemed to be trying to manipulate the examination. Phillips then asked youth to tell the truth, and youth admitted that he had shaken his son.

After youth admitted shaking his son, Phillips called Skinner and Chuck Newell, who returned to the police station and re-interviewed youth. Both detectives denied offering any inducement to youth to get him to make incriminating statements. At approximately 12:15 p.m., almost two hours after *Miranda* warnings had been administered at the beginning of the polygraph examination, youth twice admitted shaking his son.

Youth also gave a videotaped statement two days later while in a break room next to his son's hospital room. That statement was not preceded by a re-administration of *Miranda* warnings. The officers asked youth if he would mind clarifying his earlier admissions. He agreed to do that and went to the break room with the officers. At the end of the videotaped statement, one of the officers asked if any promises or deals had been made by the officers. Youth answered, "No." The officer then asked if youth had made his

statement voluntarily. Youth said, "Yeah, I guess." The officer asked him what he meant, and youth said that he made the statement because "I have to." The officer again asked what he meant. Youth said that he had to make the statement because the officers "want[ed] to know what's wrong." Youth continued that he just wanted to get this over with, that he shook his infant and that was wrong, that he did not know if he was going to jail or to counseling. He ended by saying that he was going to "learn to take the blame." The officer then asked if youth was taking the blame because he was responsible and youth responded, "Yeah, I guess." Youth earlier had stated that he used phrases such as "I guess" or "I don't know" as a manner of speech and that they did not actually indicate doubt.

Youth later recanted his statements, stating that he had not shaken his son. On February 7, 1997, Detective Terry Newell was called to the juvenile detention center, where youth was then housed, because youth had asked to speak to the investigators about his case. According to Newell, youth stated that he thought that Phillips had lied to him:

> "He said that the detective who gave him the [polygraph examination] had told him that if he admitted to shaking the baby, that he would get counseling, and that was what he needed. He said he agreed to do that, and he spoke with Detective Skinner, and he admitted shaking the baby, although he stated that he never actually did shake the baby."

Youth moved before trial to suppress all of the inculpatory statements that he had made about shaking or injuring his son. The trial court denied the motion. Youth subsequently was tried before a jury in adult court, which found him guilty of assault in the fourth degree and criminal mistreatment in the first degree. The court transferred the case to juvenile court for disposition on the convictions. *See* ORS 419C.361. The juvenile court ordered that youth be made a ward of the court and that he be committed to OYA for a period not to exceed six years.

Youth raises a number of arguments in support of his contention that the court erred in denying his motion to

suppress various statements that he had made. We address them in turn.

■ Youth contends that the police did not give him *Miranda* warnings before he made some of the statements and, as a consequence, that those statements were inadmissible. The state constitution requires *Miranda* warnings to be given before the police question a person if the person is in full custody. *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990). In addition, the warnings are required in circumstances that, although falling short of full custody, involve a "setting which judges would and officers should recognize to be 'compelling.'" *Id.* Under the federal constitution, *Miranda* warnings must be given before questioning when a person is "in custody," that is, when a person's freedom has been "significantly restrained," even if the person is in his or her own home or other familiar surroundings. *Oregon v. Elstad*, 470 US 298, 309, 105 S Ct 1285, 84 L Ed 2d 222 (1985). Conversely, *Miranda* warnings are not required under the federal constitution when the person is not in custody, even if—for example—the questioning occurs in a police station. *Oregon v. Mathiason*, 429 US 492, 495, 97 S Ct 711, 50 L Ed 2d 714 (1977).

Youth does not assert that he was in custody when he made any of the statements that he seeks to suppress. In addition, he was given *Miranda* warnings before he made the statements at the police station. Consequently, the issue reduces to whether the circumstances in which he made the statements at home and at the hospital were compelling enough to require *Miranda* warnings to have been given before the statements were made. We conclude that they were not.

The detectives who interviewed youth at his home were dressed in plain clothes and did not display any weapons. Youth's mother attended the interview. Nothing in the record suggests that the officers said or did anything that would make the circumstances of the interview compelling or that would lead youth reasonably to believe that his freedom had been significantly restrained. Consequently, neither the state nor federal constitution required the officers to give

youth *Miranda* warnings before they questioned him at his home.

The videotaped interview at the hospital occurred two days after the polygraph examination and interview of youth at the police station, at which youth had been given *Miranda* warnings. The detectives again were in plain clothes and did not display any weapons. They conducted the interview in a break room next to the hospital room of youth's son. Here again, nothing about those circumstances or the statements and behavior of the officers created conditions that required the officers to give youth *Miranda* warnings before they questioned him. Consequently, none of the statements was subject to suppression on the ground that the officers who obtained the statements failed to give youth necessary *Miranda* warnings.

■ ■    Youth also contends that the statements at issue were made involuntarily and, for that reason, should have been suppressed. The issue of voluntariness is separate from whether *Miranda* warnings were properly given. The state has the burden of proving that youth's statements were voluntary. That is typically done by establishing that the statements were not the product of any coercive police conduct, such as the use of threats or promises. *See, e.g., State v. Bea,* 318 Or 220, 230, 864 P2d 845 (1993).

■    Youth claims that the police improperly induced him to make inculpatory statements by promising him leniency. A statement obtained by a promise of leniency is involuntary. *See, e.g., State v. Goree,* 151 Or App 621, 631, 950 P2d 919 (1997). We conclude, however, that youth's statements were not induced by promises of lenient treatment.

All of the officers denied making any promises to youth. Skinner testified that on several occasions he told youth that the District Attorney was the person who would decide how to deal with youth's conduct, which necessarily implied that the police officers to whom youth spoke did not have the authority to determine the consequences that would attach to his statements. Moreover, youth's testimony belies his claim that promises were made to him. He said that the polygraph examiner

"didn't say 'you could have anger management classes,' but he was asking me a bunch of stuff about shaking babies, and—what have you, whatever, and he pretty much was like, well do you think that you should—you should go to anger management class, and just different—he—he—just started mentioning like, counseling or something, and—and then—stuff like that. But I'm not—I'm not too sure."

Youth gave similar testimony about statements that were made to him by Detective Skinner:

"Oh, sorry. I'm not really sure what—he [Skinner] talked to me about something when we were sitting at the table about—he told me if I just confessed—about anger management classes, and then when they—when Phillips said, 'you should go to anger management classes' or what—whatever, and I just figured, if I just said it, it'd just all be over. Maybe I could get counseling, I mean, I didn't know what was going to happen, I just figured—so I just said it, and then this'll all be over. It's a lot of pressure and stuff."

That testimony does not suggest that the police made any promises of leniency on which a reasonable person would have relied. Moreover, youth admitted in his videotaped statement that he did not know if he would receive jail or counseling as a result of his statements. In other words, youth did not believe that counseling had been promised or that other punishments had been excluded in exchange for his statements. Thus, the record does not support youth's assertion that he relied on promises of leniency when he made his statements to the police.

■       Youth also contends that the police induced him to confess by suggesting that if he did so the police would stop the "harassment of his family." On that issue, youth testified, in response to a question about whether he felt pressured by the police to make inculpatory statements:

"Not at first, but after, like, the second day and stuff, they [the police]—they started being a little bit more pushy, and coming out like my—like my mother states, five minutes, and they'd call, and then they just showed up and stuff, and—"

That testimony is wholly insufficient to establish that the police harassed youth's family or that youth's statements were induced by such harassment.

■ Finally, youth claims that personal factors—his youth, his stress over the birth of his son, and the manner in which he responds to stress—rendered his statements involuntary. Youth was 16 years old at the time that he made the statements and has above average intelligence. In light of those facts, the factors that youth identifies are insufficient to establish that his statements were involuntary.

In summary, we conclude that youth's statements were voluntary. Hence, the trial court properly denied youth's motion to suppress them.

Youth's other claims of error either have been decided against him, *see State ex rel Juv. Dept. v. Johnson,* 168 Or App 81, 7 P3d 529 (2000), or were not preserved and do not constitute error apparent on the face of the record. *See, e.g., State v. McCoy,* 152 Or App 393, 394, 952 P2d 572, *rev den* 327 Or 83 (1998). We therefore reject them without discussion.

Affirmed.