Argued October 31, reversed and remanded December 10, 1973,
petition for rehearing denied January 23, petition
for review denied March 19, 1974

# STATE OF OREGON, *Respondent, v.* JOHN LEON BURNS (No. 29409), *Appellant.*
516 P2d 748

*John K. Hoover,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Scott McAlister,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and THORNTON and TANZER, Judges.

TANZER, J.

Defendant was convicted of murder, ORS 163.115, and sentenced to life imprisonment. He assigns as error the failure of the trial court to submit upon timely request the issue of self-defense to the jury. Defendant is entitled to such an instruction if there is evidence from which the jury could infer that defendant's conduct was legally justified under the existing law of self-defense. *State v. Anderson,* 207 Or 675, 695, 298

P2d 195 (1956); *State v. Nodine,* 198 Or 679, 717, 259 P2d 1056 (1953).

The testimony given by the only two living eyewitnesses to the killing, defendant and his wife, was essentially identical. Defendant's two minor daughters did not see the killing or the events immediately preceding it, but they did testify as to what they heard from upstairs, and their recollection of the incident was consistent with that of their parents.

The evidence shows that the deceased, Robert McCoy, had been living with defendant and defendant's wife in their home prior to the killing. The three individuals had been drinking at various establishments on the night of February 28, 1973, and returned home at approximately 1:30 the following morning. Defendant and his wife both testified that McCoy had been acting in an obnoxious fashion throughout the evening, despite their efforts to quiet him. When they arrived at home, McCoy had fallen asleep in the car and defendant and his wife decided to leave McCoy in the car to sleep.

Shortly after defendant and his wife went to bed, McCoy came in the house and, indicating that he was cold, began kicking and cursing the heater saying that he wanted the heater turned on. At that, defendant's wife got out of bed and told McCoy that he would have to either stop cursing and go to bed, or else leave the house because she did not want her children (who were upstairs) to hear his foul language. McCoy complied with her request momentarily, but soon began to curse and kick the heater again. This time defendant came out of the bedroom with his wife and told McCoy to leave the house and sleep in the car. McCoy responded that defendant was not man enough to make

him leave, and that he was not going to leave because it was too cold outside. Defendant replied, "If I get my gun, you'll get out," and went back into the bedroom. Defendant proceeded to get a .22 caliber rifle out of a closet and load it. While defendant was loading the rifle, defendant's wife continued to plead with McCoy to leave the house, but McCoy refused.

Defendant emerged from the bedroom holding the rifle and again told McCoy to leave, informing him that he would shoot him if he did not leave. McCoy replied that defendant did not have the "guts" to shoot him and moved toward defendant, grabbing at the rifle. While he was reaching for the rifle, McCoy told defendant that if he were successful in getting it away from defendant he would beat defendant over the head with it. As McCoy grabbed at the gun, defendant raised the rifle and backed away from McCoy, waving the gun from side to side to keep McCoy from grabbing it. Neither defendant nor his wife could testify whether McCoy actually touched the gun. Finally, defendant backed into a television set, and as he did so, the gun discharged. Defendant testified that he did not think he pulled the trigger, and that he did not intend to pull the trigger.[1] As McCoy looked down at his wound, defendant's wife testified that defendant

---

[1] On direct examination, defendant testified as follows:

"Q   Did you pull the trigger of the gun?

"A   No, sir. I don't think I did. I definitely don't think I did.

"Q   Did you have any intent one way or another to pull that trigger?

"A   No, I know I didn't intend to pull it. I know that. I was trying to get away from him."

And on redirect, defendant testified:

"Q   Did you intentionally pull the trigger when that gun went off?

"A   No, sir. I did not, I definitely did not."

said "Yes, you're shot, you damn right you're shot, and I will shoot you again if you don't get out of my house."② McCoy told defendant that he thought he was bleeding internally, and that defendant and his wife should call an ambulance. They did so, but McCoy died before the ambulance arrived.

■ The fact that defendant claimed accident by testifying that he did not intend to kill McCoy does not deprive him of the right to an instruction on self-defense if there is also evidence in the record from which the jury could have inferred that defendant was acting in self-defense. While ordinarily a defendant is not entitled to the benefit of mutually exclusive defenses, the rush of events may be such that the memory is clouded and the testimony inconclusive as between them. Where the evidence can support the defense it is better to give the instruction and allow the jury to determine the truth from among conflicting available inferences. *Cf. State v. Anderson,* 207 Or 675, 298 P2d 195 (1956), where the court stated that a defendant who denies the homicide is still entitled to an instruction on self-defense if the evidence in the record supports it.

Whether defendant's evidence entitled him to a jury instruction on the issue of self-defense is governed by ORS 161.219 and ORS 161.225(2), which limit a per-

② The testimony of the other people in the house differed to a minor extent from that of defendant's wife. Defendant himself testified that McCoy said "I am shot" and that defendant replied, "yeah, and I'll shoot you again if you don't get out of here." One of defendant's daughters, Sherry Burns, testified that McCoy said "Why did you do that for, John," and that defendant responded "You're shot, damn you, that's right, your [sic] shot. If you don't get the hell out of here, I am going to shoot you again." Defendant's other daughter, Teresa Burns, testified that defendant simply said "You're shot."

son's right to use deadly physical force in defense of his person or premises.

ORS 161.219[9] provides, in pertinent part, that a person is not justified in using deadly physical force in defense of his person unless he reasonably believes that the other person is either (1) committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person, or (2) using or about to use unlawful deadly physical force against a person.

ORS 161.225 (2),[10] dealing with the defense of premises, provides that in order to justify the use of deadly

---

[9] The full text of ORS 161.219 is as follows:

"Notwithstanding the provisions of ORS 161.209, a person is not justified in using deadly physical force upon another person unless he reasonably believes that the other person is:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Committing or attempting to commit a burglary in a dwelling; or

"(3) Using or about to use unlawful deadly physical force against a person."

[10] ORS 161.225 provides:

"(1) A person in lawful possession or control of premises is justified in using physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon the premises.

"(2) A person may use deadly physical force under the circumstances set forth in subsection (1) of this section only:

"(a) In defense of a person as provided in ORS 161.219; or

"(b) When he reasonably believes it necessary to prevent the commission of arson or a felony by force and violence by the trespasser.

"(3) As used in subsection (1) and paragraph (a) of subsection (2) of this section, 'premises' includes any building as defined in ORS 164.205 and any real property. As used in paragraph (b) of subsection (2) of this section, 'premises' includes any building."

physical force, there must be an actual or attempted criminal trespass (which defendant's evidence indicated to have occurred here),[8] plus one of the following circumstances: Either the actor must be acting in defense of a person as provided in ORS 161.219, or he must reasonably believe that deadly physical force is necessary to prevent the commission of arson or "a felony by force and violence" by the trespasser. ORS 161.225 (2)(b).

The self-defense sections of the 1971 Oregon Criminal Code are "basically a codification of Oregon case law doctrines," designed to "formulate statutory guidelines to be followed in determining when and to what degree a person is justified in using physical force against another in self-defense." Commentary at 23-24. It is therefore necessary to look to the cases which have articulated the principles in this area.

The first Oregon case dealing with justifiable homicide is *Goodall v. State,* 1 Or 333, 80 Am Dec 396 (1861), in which the court stated that the jury should have been instructed that if they believed that there was "reasonable ground for [the defendant therein] to believe his life in danger, or that he was in danger of great bodily harm from the deceased, and that such danger was imminent, and he did so believe, and acting

---

[8] ORS 164.245 provides:

"(1) A person commits the crime of criminal trespass in the second degree if he enters or remains unlawfully in or upon premises.

"(2) Criminal trespass in the second degree is a Class C misdemeanor."

ORS 164.255 reads as follows:

"(1) A person commits the crime of criminal trespass in the first degree if he enters or remains unlawfully in a dwelling.

"(2) Criminal trespass in the first degree is a Class A misdemeanor."

on such belief killed the deceased, he was excusable; and that it was not necessary that he should wait until an assault was actually committed." 1 Or at 337.

These basic principles have been restated in numerous subsequent self-defense cases, including the leading Oregon cases of *State v. Rader,* 94 Or 432, 186 P 79 (1919), and *State v. Gray,* 43 Or 446, 74 P 927 (1904). Because of the similarities of those cases to the case at bar, and also because of the Criminal Law Revision Commission's express reliance upon them in formulating the statutory standards (*See* Commentary at 24-25), we consider the facts of those cases at some length.

In *Gray,* the defendants were walking down a road past the decedent's premises when a conversation started between defendants and the decedent. The decedent became angry, leaped the fence, and walked toward one of the defendants in a threatening manner. One of the defendants drew a pistol and warned the decedent to withdraw. The decedent disregarded the warning and continued to advance toward the defendant, threatening to take the gun from defendant and "beat his brains out with it." When decedent came within reach of defendant, he seized the gun, and attempted to take it away from defendant. During the ensuing struggle, the decedent was shot and killed. The trial court instructed the jury that taking the decedent's life could only be justified if defendant were threatened with "great bodily harm" and that danger of battery was not sufficient. In so doing, it refused to give an instruction that the killing was justified if defendant "had reason to believe, and did believe, that he was in imminent danger of death or great bodily harm at the hands of the deceased." The Oregon Supreme Court

held that the refused instruction should have been given:

> "* * * Where * * * the assault is attended with such demonstration [of imminent danger to life or great bodily injury, real or apparent], and the present ability to execute it, whether the assailant is armed with a deadly weapon or not, as to indicate that he is in imminent danger of being beaten and maltreated, and probably disfigured or maimed, or his life imperiled, he has a right to withstand the assault, even to the taking of the life of the aggressor." 43 Or at 455.

The *Gray* court concluded that "[t]he present was manifestly a proper case to be submitted to the jury * * * as to whether the defendant, at the time he fired at the deceased, acting from the standpoint of a reasonable man, had reason to believe that he was in imminent peril of great bodily harm or of losing his life." 43 Or at 455-456.

The facts of the *Rader* case were substantially similar. Defendant, armed with a rifle, entered into a conversation with the decedent. During the conversation defendant set the rifle aside, and shortly thereafter the deceased struck defendant a number of times. While being attacked, defendant drew a pistol and fired, killing the deceased. The *Rader* court phrased the standard in the following way:

> "* * * [T]he killing of an assailant will not be justifiable unless, judging of the situation from the standpoint of a reasonable man under all the circumstances surrounding the defendant at the time, he has reasonable cause to believe himself to be in imminent danger of death or great bodily harm at the hands of his assailant. * * *" 94 Or at 446.

The passage of time has not significantly altered

these basic principles. This court stated in *State v. Hansen,* 3 Or App 378, 381, 474 P2d 17 (1970):

> "Our Supreme Court has consistently held in justifiable homicide cases that the defendant must have reasonably believed that he was in danger of death or great bodily harm to be entitled to assert self-defense. * * *"

■ ■ Since the legislature's intention in enacting ORS 161.219 and 161.225 (2) was to codify the common law of self-defense and not to articulate a new standard, we conclude that the statutory phrases requiring that there be a "felony involving the use or threatened imminent use of physical force against a person," "unlawful deadly physical force," or a "felony by force and violence" are the functional equivalents of the case law's requirement of "great bodily harm."[◎] Thus, if there is evidence in the record that defendant could have reasonably believed that he was in imminent danger of receiving great bodily harm from McCoy, he was entitled under either section to an instruction on self-defense. The evidence that McCoy told defendant that he (McCoy) would take defendant's gun from him and beat him over the head with it, and then acted upon his threat by advancing upon the retreating defendant and grabbing at the weapon would enable a jury to infer that defendant reasonably believed himself in imminent danger of great bodily harm. It was, therefore, error to refuse defendant's request for an instruction on the issue of self-defense.

---

[◎] The equivalence of these concepts was recognized in State v. Rader, supra, 94 Or at 486 (Harris, J., concurring), and again in State v. Hansen, 3 Or App 378, 382, 474 P2d 17 (1970), where the court stated:

> "* * * Fear of 'great bodily harm' is thus a requirement in homicide cases, because the statute requires fear of a felony."

■■ One further point merits discussion. The state contends that defendant was not entitled to an instruction on the law of self-defense because defendant introduced the firearm into the conflict and was thus the aggressor. A person may not provoke a quarrel to the point where weapons are used, and then justify his slaying of his opponent on the ground of self-defense. *See State v. Joseph,* 230 Or 585, 371 P2d 689 (1962); *State v. McCann,* 43 Or 155, 72 P 137 (1903); *State v. Hawkins,* 18 Or 476, 23 P 475 (1890). In this case, however, defendant was attempting to terminate McCoy's criminal trespass, and he was authorized to use reasonable physical force to do so pursuant to ORS 161.225 (1). *See* n. 4, supra. The defendant's act of producing the firearm and threatening to use it, on the one hand, and his actually using it, are separate acts with distinct legal significance. The threat of deadly force does not constitute the use of deadly physical force. *See* LaFave and Scott, Criminal Law 392, § 53. Deadly physical force was not used until defendant actually fired the gun, and the justification for that action must be assessed in light of the circumstances at the precise moment in which defendant acted. While the introduction of a firearm into the altercation may have been unwise, that act does not deprive a person of the right to claim self-defense as to those matters which occur subsequently.

Reversed and remanded.