Argued and submitted August 19, 2014, reversed and remanded July 29, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TENVIN T. FINONEN,
*Defendant-Appellant.*

Multnomah County Circuit Court
111135003; A151989

356 P3d 656

Lindsey K. Detweiler, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Ryan P. Kahn, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

Under Article I, section 12, of the Oregon Constitution, law enforcement officers must "inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution." *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010).[1] An exclusionary rule applies when an officer does not meet that obligation:

> "If the police conduct a custodial interrogation without first obtaining a knowing and voluntary waiver of the suspect's rights, then they violate the suspect's Article I, section 12, rights. To give effect to those constitutional rights, the state is precluded from using, in a criminal prosecution, statements made in response to the interrogation."

*Id.*; *see also State v. Delong*, 357 Or 365, 372, 350 P3d 433 (2015) (discussing *Vondehn*). That exclusionary rule is not limited to precluding the state from using statements unlawfully obtained from a defendant during the state's case-in-chief. Rather, the exclusionary rule also bars the state from impeaching a defendant on cross-examination with statements that the defendant made during custodial interrogation, after law enforcement officers delivered *Miranda* warnings but then ignored the defendant's request for counsel. *State v. Isom*, 306 Or 587, 594, 761 P2d 524 (1988). This case presents the question expressly left open in *Isom*: whether a defendant's uncounseled statements are inadmissible for impeachment purposes, when the defendant made those statements during custodial interrogation and "no warnings were given and no request for a lawyer was ever made." *Id.*[2]

---

[1] Article I, section 12, provides in part, "No person shall * * * be compelled in any criminal prosecution to testify against himself." In keeping with the Oregon Supreme Court's practice, we refer in this opinion to the reading of rights required under Article I, section 12, as *"Miranda* warnings," named for the United States Supreme Court's decision, based on the Fifth Amendment to the United States Constitution, in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). *See State v. Delong*, 357 Or 365, 369, 350 P3d 433 (2015) (using that terminology).

[2] As detailed below, the officers in this case did read *Miranda* warnings to defendant; the apparent basis for the state's concession that an Article I, section 12, violation occurred is that defendant did not understand the warnings that were given before custodial interrogation commenced. *Cf. State v. Lunacolorado*, 238 Or App 691, 695, 243 P3d 125 (2010), *rev den*, 350 Or 530 (2011) (a suspect

For the reasons set out below, we hold that such statements are inadmissible for impeachment purposes. Accordingly, we reverse and remand.[3]

The facts leading up to defendant's conviction on assault charges are not in dispute. Defendant immigrated to the United States from Micronesia in 2007. English is not his native language. A language expert who assessed defendant testified that his ability to understand and communicate in English is "at a very basic level."

Defendant and his roommate, A, had a drunken argument at a friend's apartment that escalated into a physical altercation. The altercation ended with A suffering a serious slash wound to the chest and abdomen. Other than defendant and A, no witnesses saw how the wound was inflicted, and, as we explain in more detail below, the two men told different stories about it.

After the altercation ended, A's brother-in-law, Ludwig, came out of the apartment and discovered A lying on the ground. He went back inside and asked someone to call for an ambulance, then came back outside and saw defendant. Ludwig grabbed defendant by the jacket and asked him what had happened. Defendant slipped out of his jacket and fled. He was stopped by a police officer a few blocks away. After the officer patted him down, defendant sat on the sidewalk while the officer awaited instructions. A few minutes later, defendant looked at the officer and said, "I fucked up," and then, "Fucking pissed me off." The officer eventually took defendant to the police station.

---

"who does not understand the *Miranda* warnings" cannot validly waive them). Any distinction between statements made in the absence of *Miranda* warnings and statements made absent the defendant's *understanding* of those warnings is not material to the Article I, section 12, analysis. In both situations the defendant's statements are presumptively involuntary and subject to suppression. *Id.*

[3] Defendant makes two additional arguments on appeal. First, he challenges the admission of two statements that he made before he was in police custody, arguing that the probative value of the statements was outweighed by the danger of unfair prejudice. We reject that argument without discussion. Second, defendant argues that the statutorily mandated 70-month sentence imposed on his second-degree assault conviction in this case is unconstitutionally disproportionate. Because we are reversing and remanding this case, we do not reach the sentencing issue.

Defendant was interviewed at the police station by Detectives Dran and Sharp. At the outset, Dran read defendant's *Miranda* rights to him from a printed sheet. He then asked defendant if he understood his rights. Defendant responded, "Yes, no, maybe so." Dran asked again if he understood, and defendant said, "Yes, no, everything, yes, no, everything, yes, no, everything." Dran told defendant that he was "not in the mood to play silly, stupid games." Defendant protested that he was not stupid. Dran said, "I did not call you stupid. Listen. Listen. I don't want to play silly games. I asked you a simple question, do you understand your rights. The answer is, yes, I understand; or no, I don't understand. Okay?" Defendant responded incoherently.

Sharp asked defendant whether he had been drinking, and an exchange ensued about how much alcohol defendant had consumed and whether he was still drunk. Dran then attempted to explain the seriousness of the situation to defendant and began reading the *Miranda* warnings again. Before he finished, defendant, who thought that Dran was the officer who had arrested him and to whom he had made several statements, interjected and said that everything that he had said earlier was true. Dran said that he had not been the arresting officer and then returned to the issue of defendant's rights: "So, uhm, do you want me to read these rights to you again, or do you—do you understand your rights that I read to you?" Defendant mumbled, "Yeah, I understand (inaudible)." Dran asked again: "You understand these rights I read to you? You understand this stuff?" Defendant nodded.

Dran then began asking about the incident with A. Defendant said that A had "pissed [him] off" and that he had punched A and then run away. He said that, after he had been arrested, he told the arresting officer, "Somebody fucking piss me off, I punch you, I'm taking off." Later, Dran asked defendant why he had run away after punching A. Defendant told Dran, "I'm nervous for the cops. He told me, 'Fuck you!' I told [him], 'You, fuck you, you fucking wait, the fucking cops is coming for you.'" Dran concluded the interview shortly thereafter. At some point during the interview, defendant made a "punching motion" to demonstrate to the officers how he had hit A.

Defendant was charged with one count of first-degree assault and one count of second-degree assault. While he was in jail awaiting trial, defendant had several telephone conversations with a friend, Hutchinson. In one conversation, defendant told Hutchinson that he had hurt A because A talked too much.

Before trial, defendant moved to suppress the statements that he had made to Dran, arguing that he had not validly waived his right against self-incrimination. The prosecutor did not contend that defendant had validly waived his rights, and she indicated that she did not intend to offer any of defendant's statements to Dran in the state's case-in-chief. However, the prosecutor asserted that she had the right to use those statements as impeachment "should certain testimony arise from the defense at the time of trial." The prosecutor cited *State v. Mills*, 76 Or App 301, 710 P2d 148 (1985), *rev den*, 300 Or 546 (1986), in which we held that statements that the defendant made after police officers failed to honor his request for an attorney were inadmissible in the state's case-in-chief but could be admitted to impeach the defendant's testimony. We based that holding on a concern that a defendant should not be able to perjure himself without consequence, asserting that it would be "a perversion of an Oregon constitutional right to turn a shield (the right to keep the state from using illegally obtained evidence) into a sword (the right to take affirmative advantage of the unavailability of that evidence to work a fraud on the trier of fact)." *Id.* at 310. The trial court expressed uncertainty about whether *Mills* would survive renewed appellate scrutiny, but it concluded that it was bound by that case. Accordingly, it ruled that defendant's statements were admissible for impeachment purposes.

At trial, A testified about the stabbing incident. According to A, defendant was the aggressor. After the two men argued inside their friend's apartment, defendant went outside and then called to A to come out. When A, who was unarmed, went out and approached defendant, defendant ran away. A started to go back inside, but he heard footsteps behind him. As he turned back around, A testified, defendant stabbed him.

Defendant also testified at trial, through an interpreter. According to defendant, after he and A argued, he left the apartment and began walking to a bus stop. A followed him, carrying a meat cleaver and a small baseball bat. Defendant told him, "[F]ollow me and the cops will get you." A threw the cleaver at defendant, but it did not hit him. Defendant bent down to pick up the cleaver so that A would not be able to throw it at him again. While he was bent down, A charged at him, wielding the bat. Defendant ran toward A in an attempt to knock him off balance. Defendant was holding the cleaver backwards, with the blade along his forearm. A struck defendant on the shoulder with the bat, breaking the bat in half. The two men then collided, and A fell to the ground. Defendant did not realize that he had cut A, and he walked away. When he saw that A was not following him, defendant went back to check on him and saw that he was unresponsive and bleeding. Defendant ran to a woman who was walking up the street and asked her to call the police. He then walked back toward the apartment, where he encountered Ludwig. Ludwig grabbed his jacket, and defendant was afraid that Ludwig was going to beat him up, so he slipped out of the jacket and ran away.

Defendant testified that he had not intended to cut A and that "maybe it was an accident."

Defendant's lawyer had defendant come off the witness stand and demonstrate how he had hit A. Defendant's demonstration is not described in the record, but the prosecutor later made a comment to the judge that indicates that what defendant showed the jury differed from the "punching motion" that defendant later acknowledged he had showed Dran and Sharp during the interview.

Defendant's counsel asked him what he had meant when he told the arresting officer that A had "pissed [him] off." Defendant replied, "I meant he wanted to beat me up."

On cross-examination, the prosecutor brought up defendant's interview with Dran, first asking, "[Y]ou never mentioned to the detective that [A] had a knife, did you?" Defendant said that he could not remember whether he had told Dran or the arresting officer that A had "chased [him] with a baseball bat and a knife." The prosecutor then asked,

"You never told Detective Dran that you were hit with a baseball bat, did you?" Defendant initially answered, "Yes," but then said that he did not know whether it was Dran whom he had told. The prosecutor then challenged defendant's testimony that A's injury had been accidental:

"Q   You told this jury that maybe it was an accident that you cut [A,] correct?

"A   Yes.

"Q   But you told the detective that you hit [A] with your fist because he pissed you off; right?

"A   Yes.

"Q   You told the detective, 'When somebody fucking pissed me off, I punch you'?

"A   Yes.

"Q   When you tell the detective somebody fucking pissed you off, that means that you are mad; right?

"A   No. I think I was trying to tell him that the guy was trying to beat me up, and that's what I meant to say."

The prosecutor also asked defendant if he remembered telling the detectives that he had told A, "Fuck you, you wait for the cops." Defendant replied that he did not remember if he had said that.

The prosecutor then asked defendant if he remembered showing the detectives how he had punched A. Defendant said that he did not remember, because he had been drunk at the time. The prosecutor repeated the question, and defendant again answered, "I don't remember any more." The prosecutor asked, "Would it be helpful to show you a videotape of you having the conversation with the detectives?" Defendant said that he thought it would help him remember, so the jury was sent out and a recording of the interview was played. When the jury returned, the prosecutor again asked defendant if he had told Dran, "When somebody fucking pissed me off, I punch you." Defendant replied, "That's the one that when he was asking me questions, I was really confused because I was tired and I wanted to go to sleep." The prosecutor asked again whether he had made the statement, and defendant answered, "Yeah. What

I told him, I really meant to say that this guy was chasing me to beat me. And when I said those, I was really tired, and everything I said was wrong because I wanted to go to sleep."

The prosecutor then resumed questioning defendant about whether he had shown Dran how he had hit A:

"Q    But you also showed him physically what you did to [A], right?

"A    Yes. All those things that I told the police downtown to be negatively impacting me, because I was not straight, I was tired, I wanted to get to sleep.

"Q    Okay. I understand that, [defendant]. But listen to my question carefully, okay? We just watched a video of you; correct?

"A    Yes, it's true. But like I'm telling you, I'm using that phrase, that American phrase, because I don't know how to even express what I was telling him.

"Q    Okay. But getting down to my question, we just watched a video, yes or no?

"A    Yes, I told you that's correct, and that was not the meaning I was thinking.

"Q    [Defendant], you were on that videotape talking to Detective Dran, right?

"* * * * *

"[A]    Yes.

"* * * * *

"Q    You were on the video showing Detective Dran how you punched [A]; correct?

"A    Yes. Whatever I told [the] detective, it was different from the one I told him in the first one [the arresting officer]. But, I was really tired because I didn't have enough sleep, so I was just telling him those stories. But then I didn't know what I was telling him.

"Q    [Defendant], I understand that you were tired that night. But my question for you is, on the video, did you make a motion with your arm to show how you made a punch?

"* * * * *

"[A]  I didn't know what to say, that's why I used those words.

"Q  Okay. So you did make a punching motion?

"A  Yes.

"Q  Okay.

"A  Yes. I was going to express the fact that he was trying to hit me with a baseball bat, but I was just using those words because I didn't know what to use—I didn't understand what to use."

Finally, the prosecutor brought up the statement that defendant had made in a telephone call with Hutchinson. She asked defendant if he had told Hutchinson that he had "hurt [A] because he talked too much[.]" Defendant replied, "Yes. I told him and I was going to explain to him, but because this was the first time this ever happened to me, so I didn't know what to do. I just used those words."

The jury found defendant guilty of one count each of second-degree assault and third-degree assault. This appeal followed.

Defendant assigns error to the trial court's ruling that allowed the state to use his statements to Dran for impeachment purposes. He asserts that he did not validly waive his right against self-incrimination under Article I, section 12. Defendant argues that, when a police officer obtains statements from a defendant in violation of Article I, section 12, the statements must be suppressed in order to restore the defendant to the position he would have been in had the officer acted lawfully. In defendant's view, the state must be precluded from using illegally obtained statements for any purpose, including impeachment. He asserts that *Mills*, on which the trial court relied, is no longer good law. According to defendant, the Supreme Court's decisions in *Isom* and *Vondehn*, read together, demonstrate that the rationale in *Mills* is no longer viable.

In its response, the state does not challenge defendant's assertion that he did not validly waive his right against self-incrimination. The state contends, however, that the trial court appropriately allowed defendant's statements to come in for impeachment purposes. The state acknowledges

that, had *Mills* been decided after *Isom,* the result would have been different, because the facts in *Mills* were materially indistinguishable from those in *Isom*: in each case, the defendant made incriminating statements after police officers delivered *Miranda* warnings but then continued to question the defendant after he requested an attorney. In *Isom,* the Supreme Court held that those statements could not be used to impeach the defendant after he decided to testify at trial; the same result, the state acknowledges, would have had to follow in *Mills.* Nevertheless, the state asserts that our underlying reasoning in *Mills* remains sound, and it urges us to adopt that reasoning and apply it to cases in which, as here, the defendant made the pertinent statements without having been given *Miranda* warnings (or without having understood the rights that he was read) and without having first requested counsel. The state also contends that any error in admitting the statements was harmless.

We begin by confirming that *Mills* does not survive *Isom.* As we have explained, the facts in those two cases are materially indistinguishable, and if *Mills* had come before us after the Supreme Court issued its opinion in *Isom,* we necessarily would have reached a different result. Accordingly, our holding in *Mills* can no longer be considered good law.

The question remains, however, whether, as the state contends, the underlying rationale of *Mills* remains viable in circumstances like those involved in this case. In determining the answer to that question, we first consider settled Article I, section 12, principles, for the moment putting *Mills* aside. Under Article I, section 12, *Miranda* warnings are required before custodial interrogation "because of the inherent level of coercion that exists in such interrogations" and because "a lawyer's presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination." *Vondehn,* 348 Or at 472-73 (internal quotation marks omitted). Thus, when "police conduct a custodial interrogation without first obtaining a knowing and voluntary waiver of the suspect's rights, * * * they violate the suspect's Article I, section 12, rights." *Id.* at 474. Accordingly, "the state is precluded from using, in a criminal prosecution," statements that a suspect made during custodial interrogation after (ineffectively) invoking

his right to counsel because excluding those statements is the way in which the suspect's Article I, section 12, rights can be "give[n] effect." *Id.*[4]

For more than two decades, the Supreme Court has consistently taken that kind of "rights based" approach in considering whether suppression is appropriate because of an Article I, section 12, violation. *See, e.g., State v. Jarnagin,* 351 Or 703, 716-17, 277 P3d 535 (2012) (explaining when suppression of evidence obtained after a *Miranda* violation "is necessary to vindicate the defendant's Article I, section 12, rights"). Most explicitly, the court made clear in *State v. Simonsen,* 319 Or 510, 878 P2d 409 (1994), that the rights-based rationale that has traditionally guided the Article I, section 9, suppression analysis also governs the suppression analysis under Article I, section 12.[5] In that case, the defendant had been arrested for aggravated murder and taken to jail. A detective moved the defendant out of the jail the next morning and took him to a remote location. Although the defendant's court-appointed lawyer went to the jail and demanded that all questioning of the defendant cease, that message was not relayed to a detective who was interrogating the defendant, and the defendant made incriminating statements. *Id.* at 512-13. The trial court denied the defendant's subsequent suppression motion on the ground that "the detective interrogating defendant had not been told personally about the lawyer or his requests." *Id.* at 513.

The Supreme Court reversed, holding that the defendant's statements should have been suppressed, notwithstanding the trial court's finding that "the detective's intention in sequestering [the] defendant was benign." *Id.* at 518. That finding was "beside the point," the Supreme Court explained, given "[t]he rationale for not permitting

---

[4] We recognize that, in certain circumstances, statements that police officers obtain following an Article I, section 12, violation may not "derive from" the violation in a way that requires suppression. *See Delong,* 357 Or at 370. The state does not make a "lack of derivation" or "attenuation" argument in this case.

[5] In the context of an Article I, section 9, violation, the Supreme Court recently reiterated that Oregon's exclusionary rule "is constitutionally mandated and serves to vindicate a defendant's personal right to be free from unreasonable searches and seizures." *State v. Unger,* 356 Or 59, 67, 333 P3d 1009 (2014). The court contrasted that "'rights-based' approach" with the federal exclusionary rule, which "is premised on deterring police misconduct." *Id.* at 67, 82.

the outcome of a trial to rest on evidence that should have been suppressed." *Id.* In explaining that rationale, the court first quoted *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992), an Article I, section 9, case:

> "'This court has declared that evidence is suppressed for violations of the Oregon Constitution "to preserve *** rights to the same extent as if the government's officers had stayed within the law." *State v. Davis*, [295 Or 227, 234, 666 P2d 802 (1983)]. *** In the context of a criminal prosecution, the focus then is on protecting the individual's rights *vis-a-vis* the government ***.
>
> "'This focus on individual protection under the exclusionary rule, a rule that operates to vindicate a constitutional right in the courts, supports the constitutional rule ***.'"

*Simonsen,* 319 Or at 518-19 (quoting *State v. Davis*, 313 Or at 253-54) (brackets and ellipses in *Simonsen*). The court applied that rights-based rationale in concluding that the Article I, section 12, violation required suppression of the defendant's statements. *Id.*

Under Oregon's rights-based exclusionary rule, the goal "is to restore a defendant to the same position as if the government's officers had stayed within the law by suppressing evidence obtained in violation of the defendant's rights." *State v. Unger*, 356 Or 59, 67, 333 P3d 1009 (2014) (internal quotation marks omitted); *see Davis*, 295 Or at 237 (exclusionary rule gives effect to citizens' constitutional right to be free from unlawful searches or seizures "by restoring the parties to their position as if the state's officers had remained within the limits of their authority"). That is what it means to say that the defendant's constitutional rights have been "vindicated."

The question before us, then, is whether a criminal defendant's Article I, section 12, rights are vindicated by an order prohibiting the state from using the defendant's unwarned statements in its case in chief, but allowing the state to use those statements to impeach the defendant during cross-examination. We conclude that such an order does not restore a defendant to the position that he or she would have been in had the Article I, section 12, violation

not occurred. Absent any violation, the defendant's choice whether to testify would not have been influenced by the existence of any unlawfully obtained statements. To vindicate the defendant's Article I, section 12, rights, therefore, the exclusionary rule must restore the defendant to *that* position, that is, to a position of being able to decide whether to testify free from concern that the prosecutor might use unlawfully obtained statements for impeachment purposes. True, that may mean that the defendant can commit perjury without fear of being contradicted by his or her own earlier statements. But the defendant would have had that same advantage had police officers not obtained unwarned statements from the defendant in violation of Article I, section 12. Application of the exclusionary rule in this situation does not, therefore, give the defendant a windfall; rather, it accomplishes—to the extent practical—the rights-based goal of returning the defendant to the *status quo ante. Cf. Unger*, 356 Or at 112 n 4 (Walters, J., dissenting) (the "'personal rights' rule is simply a rule that the state may not retain the benefit of its illegal conduct and that the defendant must be returned to the *status quo ante*").

We return to our decision in *Mills*, in which we held that a defendant's pretrial statements obtained in violation of Article I, section 12, could be used to impeach the defendant's trial testimony. The underlying rationale, which the state urges us to adopt here, was based on balancing two values critical to the integrity of our judicial system: "refusing admission to evidence that was obtained in violation of * * * the constitution" and maintaining the system's integrity by "insist[ing] that witnesses * * * obey the oath they take to tell the truth." 76 Or App at 310. We gave more weight to the second of those values, holding that to disallow the use of unlawfully obtained statements for impeachment would "simply license[] perjury." *Id.* at 311.[6]

That reasoning cannot be reconciled with the basic principle of the Oregon exclusionary rule as it has come to be understood in the years since we decided *Mills*: "to restore a

---

[6] The author of those "strong words" later disavowed them, opining that *Mills* had "raised the chance to impeach a defendant during trial above the proscriptions of our Constitution." *Isom*, 306 Or at 598 (Gillette, J., concurring).

defendant to the same position as if the government's officers had stayed within the law by suppressing evidence obtained in violation of the defendant's rights." *Unger*, 356 Or at 67 (internal quotation marks omitted). Returning a defendant to a position in which he may be able to successfully perjure himself may sometimes, at least in the abstract, frustrate "the truth-seeking purpose of our judicial process." *Mills*, 76 Or App at 310-11. But, as we have explained above, returning a defendant to that position does not give him a windfall; rather, it places him where he would have been had his constitutional rights not been violated. That vindication of constitutional rights is not, as we mistakenly characterized it in *Mills*, a "perversion." *Id.* at 310.[7]

Notwithstanding *Isom* and the other post-*Mills* cases discussed above, the state argues that the *Mills* rationale should apply here because Dran—unlike the officers in *Isom* and *Mills* itself—did not obtain defendant's statements after reading him *Miranda* warnings and then ignoring a subsequent request for counsel. Rather, the state points out, defendant did not understand the *Miranda* rights that Dran recited to him. In other words, the problem here is that defendant made the statements without having received *Miranda* warnings that he understood, not that police officers ignored a post-*Miranda*-warning invocation of the right to counsel or to remain silent. We do not find that distinction material, given the inherently coercive character of custodial interrogation.

Indeed, the Supreme Court declined in *Vondehn* to attribute any constitutional significance to a distinction between "actually coerced" and merely "unwarned" statements. In *Vondehn*, a police officer questioned the defendant after taking him into custody without giving *Miranda* warnings. Specifically, the officer asked the defendant whether he owned a backpack that was found in the car in which he had been a passenger and whether it contained marijuana. He answered both questions in the affirmative. The officer then obtained the defendant's consent to search the backpack and

---

[7] Indeed, *Mills* was not based on Oregon's rights-based exclusionary rule—which the Oregon Supreme Court had not yet applied in the context of Article I, section 12—but relied on United States Supreme Court precedent. 76 Or App at 306-08.

found a substantial amount of marijuana. The trial court excluded the defendant's statements from evidence but admitted the marijuana.

On appeal, the state argued that Article I, section 12, did not require exclusion of physical evidence derived from compelled statements and that, even if it did, the same was not true for "physical evidence derived from the 'mere failure to provide *Miranda* warnings.'" *Vondehn*, 348 Or at 470. Citing the plurality opinion in *United States v. Patane*, 542 US 630, 124 S Ct 2620, 159 L Ed 2d 667 (2004), the state argued that "such a failure does not violate a suspect's constitutional rights and that, given the important value of reliable physical evidence, the *Miranda* rule should not be extended to exclude it." *Vondehn*, 348 Or at 475. The Supreme Court rejected that argument:

> "It is immediately obvious that the premise of the state's argument does not hold here. It is the Oregon Constitution that requires *Miranda* warnings and it is the Oregon Constitution that is violated when those warnings are not given. When the police violate Article I, section 12, whether that violation consists of 'actual coercion' or the failure to give the warnings necessary to a knowing and voluntary waiver, the state is precluded from using evidence derived from that violation to obtain a criminal conviction. It follows ineluctably that, when the police violate Article I, section 12, by failing to give required *Miranda* warnings, the state is precluded from using physical evidence that is derived from that constitutional violation to prosecute a defendant."

*Id.* at 475-76.

In that respect, *Vondehn* foreshadowed *State v. Moore/Coen*, 349 Or 371, 384, 245 P3d 101 (2010), where, in a somewhat different context, the court again rejected a proposed analysis that would have distinguished between "actual coercion" and the failure to give *Miranda* warnings. *Moore/Coen* was a consolidated appeal of two defendants' cases. In both cases, the trial court admitted in the state's case-in-chief statements that the defendant had made without having received *Miranda* warnings, and the defendant testified, attempting to explain the statements. On appeal, the state conceded that the trial court had erred in admitting

the statements in both cases. However, it argued in one case that the defendant's testimony could be considered in determining whether admitting the unwarned statements was harmless. In the other case, the state argued that the defendant's trial testimony should be admissible in a retrial on remand. In both cases, the state relied on the fact that the Article I, section 12, violation consisted only of failing to give *Miranda* warnings, not actual coercion. The Supreme Court found that distinction immaterial, explaining that,

> "in determining whether exclusion of a defendant's trial testimony on retrial or from harmless error review is warranted, no distinction should be made under Article I, section 12, between statements unconstitutionally obtained by 'actual coercion' and statements unconstitutionally obtained through police interrogation not preceded by the constitutionally required warnings."

*Id.* at 384.

Vondehn and Moore/Coen confirm our conclusion that statements obtained in violation of Article I, section 12, may not be used to impeach a defendant's trial testimony, regardless of whether police officers obtained those statements by ignoring a defendant's invocation of his rights during custodial interrogation or by failing to advise a defendant of those rights (in a way that the defendant understands) to begin with. We reject the state's argument to the contrary.

In this case, the state does not contest either that Dran failed to ensure that defendant understood his *Miranda* rights or that Dran's failure to effectively explain those rights to defendant is tantamount to having failed to give *Miranda* warnings at all. It follows that Dran conducted the custodial interrogation of defendant in violation of Article I, section 12, and that the trial court erred in concluding that defendant's statements were admissible for impeachment purposes.

The state argues that we should nonetheless affirm the trial court's judgment, asserting that the error was harmless because defendant's statements to Dran were cumulative of other evidence that defendant had been angry at A. An error in admitting evidence is harmless if there is

little likelihood that it affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Here, defendant's statements to Dran did not merely echo admissible statements that he made to other people, but more clearly expressed that he hit A intentionally and did it because he was angry, undermining the credibility of his direct testimony that he might have hit A only accidentally. Moreover, the prosecutor's use of defendant's statements to Dran in cross-examination highlighted defendant's apparent reluctance to acknowledge that he had demonstrated to Dran how he had punched A. The jury could have inferred that defendant showed Dran a different punch than he had showed the jury and thus concluded that his testimony describing the incident was unreliable. Because we cannot conclude that there is "little likelihood" that the use of defendant's interview as impeachment affected the verdict, we cannot affirm on harmless-error grounds.

Reversed and remanded.