Argued and submitted December 17, 2015, affirmed April 6, petition for review denied September 15, 2016 (360 Or 401)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JERRY THOMAS HARRYMAN,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1201361; A155632

371 P3d 1213

Harrison Latto argued the cause for appellant. On the brief were Donald J. Molnar and Adam L. Dean.

Susan Reid York, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Kathleen Cegla, Assistant Attorney General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

GARRETT, J.

**GARRETT, J.**

Defendant and another man engaged in a fight while waiting in line at a grocery store. During the fight, defendant shot the victim in the leg, which ultimately led to defendant's conviction for second-degree assault with a firearm, ORS 163.175; ORS 161.610. On appeal, defendant raises three assignments of error; we reject the third without discussion. In his other assignments of error, defendant argues, first, that the trial court erred by denying his motion to suppress statements that defendant made to police while defendant was being treated for his injuries. Second, defendant assigns error to the trial court's failure to give his proposed jury instruction regarding his theory of self-defense. For the reasons that follow, we affirm.

The relevant facts are as follows. The victim and his wife were in the process of paying for their groceries; defendant was waiting directly behind the victim's wife. When she had some difficulty completing the transaction, defendant moved closer to her and placed his arm on the checkout counter. The victim told defendant to "back up" or "back [his] ass up." Following a verbal exchange between the two men, the victim ran through an adjacent checkout aisle to confront defendant. By some accounts, defendant pushed a shopping cart into the victim; by other accounts, the victim pushed a cart out of his way as he approached defendant. Several eyewitnesses testified that defendant warned the victim that he had a gun. A physical fight ensued, during which both defendant and the victim threw punches and wrestled. Witnesses described the men as approximately evenly matched in size and physical ability. Defendant then pulled out a handgun and fired it once; the bullet hit the victim in his leg. The two men continued to struggle until defendant was subdued with the help of other customers and store employees.

Before police arrived, defendant was restrained by the store's loss-prevention personnel, who placed him in handcuffs. Defendant was transported by ambulance to a hospital to receive treatment for minor injuries that he sustained during the fight. Sergeant Krummenacker had responded to the scene and rode in the ambulance with

defendant for purposes of obtaining a recorded statement. Krummenacker later testified that, at the time of the ambulance ride, police had limited information about a "chaotic" situation at the store and knew only that defendant had been "involved" in a shooting incident.

Inside the ambulance, defendant remained hand-cuffed and was strapped to a spine-immobilization board with a cervical collar around his neck. Krummenacker began the recording by advising defendant that he was being recorded and reading defendant his *Miranda* rights. When asked whether he understood those rights, defendant responded, "I don't know." Krummenacker did not initially ask any follow-up questions and observed the paramedics treating defendant. For the most part, defendant remained conversational with the paramedics, inquiring about his medical status and answering questions about his medical history. At other times, however, defendant was either unresponsive or incoherent. When defendant complained about circulation in his right hand, Krummenacker loosened defendant's handcuffs.[1] At one point, however, defendant stated that he had "hurt somebody" and that he had been "attacked." Krummenacker then asked defendant to describe what had happened inside the store. After defendant repeated that he had been attacked, Krummenacker asked several more questions about the incident, including whether defendant had shot anybody. Defendant replied that he had a gun and that he hoped that he had not shot anybody. Throughout the encounter, defendant continued to speak with the paramedics about his medical status. Defendant also made several statements that suggested that he was disoriented and confused about the events that had transpired at the store.[2]

Upon arrival at the hospital, Krummenacker concluded the first recording. Detective Copenhaver joined the

---

[1] Krummenacker testified that handcuffs have a "universal key" and that he used such a key to loosen defendant's handcuffs. However, it appears that defendant did not realize that he was handcuffed until later, when Krummenacker removed the handcuffs at the hospital at the request of medical personnel.

[2] Those statements included the following: (1) "We got overrun, didn't we?"; (2) "A lot of people got hit"; (3) "Are you the 88th or the 9th?"; and, (4) "I'm in the States?"

scene and initiated a second recording. Neither that recording nor a transcript of it is part of the record on appeal, but it is undisputed that the *Miranda* warnings were given to defendant two more times, and that, in response, defendant said, "I'll do that" but also the word "lawyer." Krummenacker continued questioning defendant. At one point, Krummenacker mistakenly told defendant that he had shot someone in the head. Defendant became emotional and denied having shot anybody in the head. Eventually, at the request of hospital personnel, Krummenacker removed defendant's handcuffs. Krummenacker later testified that that was the first time that defendant appeared to show any awareness that he had been handcuffed; he asked if he was handcuffed and whether he was under arrest. After some additional questioning by the officers, defendant requested an attorney, at which point both the questioning and recording ceased. Several hours later, defendant was placed under arrest.

Defendant moved to suppress all of his statements to the police during the ambulance ride and at the hospital. After a hearing, the trial court denied the motion as to the first recording—the one made during the ambulance ride—on the ground that defendant was neither in custody nor under compelling circumstances at that time. As to the second recording, made at the hospital, the court initially ruled that any statements made by defendant after he first said the word "lawyer" were required to be suppressed because Krummenacker had failed to clarify whether defendant was invoking his right to counsel. However, after additional discussion and post-hearing briefing, the court, in a letter opinion, concluded that compelling circumstances arose only after defendant was questioned specifically about his involvement in the shooting. Thus, the trial court suppressed some, but not all, of the statements made by defendant on the second recording.

At trial, defendant's theory of the case was that he acted in self-defense when he shot the victim in the leg. In support of that claim, defendant presented eyewitness testimony that the victim was the initial aggressor and continued his aggressive behavior despite defendant's warnings that he was carrying a gun.

At the close of the evidence, the trial court heard argument on the parties' proposed jury instructions. The state requested that the court give Uniform Criminal Jury Instruction (UCrJI) 1107 (Defense—Physical Force—Defense of Person) and UCrJI 1108 (Limitations—Defense of Person—Deadly Physical Force).[3] Defendant agreed to the giving of UCrJI 1107, but requested a modified version of UCrJI 1108 as follows:

"There are certain limitations on the use of deadly force. The defendant is not justified in using deadly force on another person unless he reasonably believed that the other person was:

"1. Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against the person. (The possible applicable felonies will be enumerated later by the court.)

"or

"2. Using or about to use unlawful deadly physical force against defendant.

"*It is not necessary for the defendant to actually wait for the assault to be committed before acting in self defense. Defendant is also not required to retreat before using deadly force against what he believed to be the imminent use of force to cause serious physical injury.*

---

[3] Those instructions are as follows:

"The defense of self-defense has been raised.

"A person is justified in using physical force on another person to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force. In defending, a person may only use that degree of force which he reasonably believes to be necessary.

"The burden of proof is on the state to prove beyond a reasonable doubt that the defense does not apply."

UCrJI 1107.

"There are certain limitations on the use of deadly physical force. The defendant is not justified in using deadly physical force on another person unless he reasonably believed that the other person was:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Using or about to use unlawful deadly physical force against defendant."

UCrJI 1108.

*"Reasonable belief is that of an ordinary person standing in the shoes of the defendant, i.e. in the defendant's position.*

*"Even if you find that the introduction of a firearm by defendant into the altercation unwise, that act does not deprive defendant of the right to claim self-defense as to those matters which occur subsequently.*

"The burden of proof is on the state to prove beyond a reasonable doubt that the defense of person does not apply."

(Emphasis added.) The court rejected defendant's instruction, concluding that this was "not a unique case" that warranted modification of the uniform instructions. Instead, the trial court gave UCrJI 1107 and UCrJI 1108. Defendant was convicted of second-degree assault with a firearm.

On appeal, defendant reprises his argument that all of his statements to police in the ambulance and at the hospital should have been suppressed and that their admission violated his rights under Article I, section 12, of the Oregon Constitution, as well as the Fifth and Fourteenth Amendments to the United States Constitution. Moreover, the evidence was harmful, according to defendant, because it allowed the jury to conclude that he was "mentally unstable," that he should not have had access to weapons, and that he "did not shoot [the victim] based on self-defense, but rather because he suffered from a psychiatric condition." Defendant acknowledges that he received *Miranda* warnings prior to questioning by the police. Defendant's contention, as we understand it, is that he did not *understand* the warnings that were given, and that his subsequent statements to the police were, therefore, involuntary and subject to suppression. *See State v. Finonen,* 272 Or App 589, 591 n 2, 356 P3d 656 (2015) ("Any distinction between statements made in the absence of *Miranda* warnings and statements made absent the defendant's *understanding* of those warnings is not material to the Article I, section 12, analysis. In both situations the defendant's statements are presumptively involuntary and subject to suppression.") (emphasis in original). Our review of that issue turns on whether the circumstances required the police to give defendant *Miranda* warnings prior to questioning. That is, if *Miranda* warnings were not required at that time, defendant's possible failure

to understand them is no longer a basis for suppression under Article I, section 12.

We begin by observing that, at trial, notwithstanding the court's ruling that some of defendant's statements at the hospital could be admitted, the state introduced only the first recording, made during the ambulance ride. Although Krummenacker's testimony briefly alluded to his later conversation with defendant at the hospital, that recording was never offered into evidence. Moreover, on appeal, although defendant takes the position that all of his statements in the ambulance and at the hospital should have been suppressed, his developed argument is limited to the ambulance ride. That is, defendant makes no alternative argument as to why he was either in custody or under compelling circumstances at the hospital at any point *before* the trial court concluded that circumstances turned compelling. Defendant also does not identify any specific statement after the ambulance ride that he contends was admitted in error, nor how any such statement was used or how it prejudiced him. In short, because the recording at the hospital was never offered at trial and is not part of the record on appeal, and because defendant's arguments all rest on the premise that his rights were violated beginning with the ambulance ride, we focus our analysis on whether the trial court erred in admitting the evidence of what defendant told police in the ambulance.

Article I, section 12, provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect that right, Oregon courts have held that, prior to questioning, "police must give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be 'compelling.'" *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (quoting *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987)).[4] In *Magee*, the

---

[4] Article I, section 12, is "an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution, as described in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966)." *Roble-Baker*, 340 Or at 633 n 1. Consistently with the Oregon Supreme Court's practice, we refer to the rights required to be provided under Article I, section 12, as *Miranda* rights or *Miranda* warnings. *Finonen*, 272 Or App at 591 n 1.

Oregon Supreme Court described the concept of "full custody" as follows:

> "The concept obviously includes extended official detention in a cell or another enclosure, with or without booking or deprivation of personal belongings. But an enclosure is not essential; one would hardly dispute that a person handcuffed on the street or in his own home is in 'full custody.'"

304 Or at 265. Thus, "[a] person is in full custody when he or she is either (1) placed under formal arrest or (2) placed under restraints by police acting in their official capacity." *State v. Warner*, 181 Or App 622, 628, 47 P3d 497 (2002).

In this case, at the suppression hearing, Krummenacker testified that defendant was not placed under arrest until several hours *after* the conclusion of his interviews with the police. And, although defendant was restrained from virtually the moment of the shooting, there is no evidence to suggest that he was restrained *by the police* or that his restraints served law enforcement purposes. To the contrary, the record reflects that defendant was handcuffed by store loss-prevention personnel for safety reasons pending the arrival of the police, and then, immobilized by emergency responders for medical purposes.[5] Moreover, the fact that a defendant is restrained in the presence of police is not conclusive evidence that he is in full custody. *See City of Portland v. Weigel*, 276 Or App 342, 345, 367 P3d 541 (2016) (the defendant's stop was not converted into an arrest when police handcuffed the defendant due to reasonable officer safety concerns). Thus, there is no basis for concluding that defendant was in "full custody" during the ambulance ride for purposes of either Article I, section 12, or the Fifth Amendment. *See Warner*, 181 Or App at 628 ("The Oregon constitutional test is comparable to the test for determining whether a person is in custody for Fifth Amendment purposes, and Oregon courts have approached the two questions using the same analysis.").

---

[5] We do not mean to suggest that there is no scenario in which an individual who was initially restrained by somebody other than a police officer can be in custody for the purposes of *Miranda*. In this case, however, there are simply no facts suggesting that defendant, who was initially restrained by the store's loss-prevention personnel and further restrained for medical purposes while in the ambulance, came within police custody during that time period.

We next consider whether the circumstances were nevertheless sufficiently compelling as to require the administration of *Miranda* warnings. In making that determination, the relevant question is "how a reasonable person in the suspect's position would have understood his or her situation" based on the totality of the circumstances. *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007). Relevant factors include (1) the location of the encounter, (2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter. *Roble-Baker*, 340 Or at 640-41. The "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

Defendant contends that the following facts illustrate that he was questioned under "compelling circumstances": Defendant had recently sustained multiple blows to his head in a physical altercation. He was then questioned as a potential shooting suspect while handcuffed, strapped to a spine immobilization board, and in close proximity to an armed police officer. Moreover, defendant was not free to leave. According to defendant, those circumstances were sufficiently compelling as to require the administration of *Miranda* warnings.

We disagree, for a number of reasons. First, "the fact that police question a person as a suspect in a crime 'does not inherently create a "compelling" setting for Oregon constitutional purposes.'" *State v. Carlson*, 311 Or 201, 205, 808 P2d 1002 (1991) (quoting *State v. Smith*, 310 Or 1, 11, 791 P2d 836 (1990)). That is so even where an officer conveys his suspicions of criminal activity after informing a defendant that he is not free to leave. *State v. Stone*, 269 Or App 745, 753-54, 346 P3d 595 (2015). Here, although defendant was questioned as a suspect in the shooting, he was not told that he was being detained or even held for investigation. Second, although the use of physical restraints may render a situation "compelling," in this case, Krummenacker testified that defendant appeared not to realize that he had been handcuffed until the conclusion of his second interview, at the hospital. Third, while it may true that defendant was, practically speaking, unable to terminate the

encounter with Krummenacker, that fact was a product of defendant being transported in an ambulance. *See Warner*, 181 Or App at 629 (compelling circumstances did not exist where the source of defendant's inability to leave the emergency room during questioning was medical immobilization for injuries suffered by the defendant in a car accident). Nor is there anything in the record to suggest that Krummenacker inserted himself aggressively into the situation in such a way that might have arguably created a "police-dominated atmosphere"; rather, the record reflects that, after defendant said, "I don't know" in response to the *Miranda* warning, Krummenacker ceased questioning and let the paramedics work. When conversation resumed between defendant and Krummenacker, nothing about the manner of Krummenacker's questioning assumed defendant's guilt, and, at no point, did Krummenacker threaten defendant, raise his voice, or otherwise engage in a show of force. *See State v. Northcutt*, 246 Or App 239, 250, 268 P3d 154 (2011) (in determining whether particular questioning necessitates *Miranda* warnings, appellate courts are concerned with "the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumption of a suspect's guilt or calculated to contradict a suspect's assertions of innocence"). Based on those facts, we conclude, as did the trial court, that the circumstances in the ambulance were not compelling so as to require the administration of *Miranda* warnings.[6] Accordingly, the trial court did not err when it denied defendant's motion to suppress.

In his second assignment of error, defendant contends that the trial court was required to give his proposed jury instruction on self-defense. As noted, defendant

---

[6] Defendant also contends that the admission of his statements to the police violated his rights under the Fifth and Fourteenth Amendments to the federal constitution. Defendant, however, makes only a cursory reference to those rights. In any event, defendant's arguments under the federal constitution fail for reasons already discussed. *See State v. Bush*, 203 Or App 605, 613, 126 P3d 705 (2006) ("Under the Fifth Amendment to the United States Constitution, a police officer is not obligated to administer *Miranda* warnings unless the suspect is 'subjected to restraints comparable to those associated with a formal arrest.'" (Quoting *Berkemer v. McCarty*, 468 US 420, 441, 104 S Ct 3138, 82 L Ed 2d 317 (1984) (citations omitted).)).

requested that the trial court instruct the jury using a modi-
fied version of UCrJI 1108, including the following language:

> "It is not necessary for the defendant to actually wait for
> the assault to be committed before acting in self-defense.
> Defendant is also not required to retreat before using
> deadly force against what he believed to be the imminent
> use of force to cause serious physical injury.

> "Reasonable belief is that of an ordinary person standing in
> the shoes of the defendant, i.e. in the defendant's position.

> "Even if you find that the introduction of a firearm by defen-
> dant into the altercation unwise, that act does not deprive
> defendant of the right to claim self-defense as to those mat-
> ters which occur subsequently."

We review for legal error. *State v. Strye*, 273 Or App 365,
368, 356 P3d 1165 (2015).

When instructing jurors, the trial court's obligation
is to "state to them all matters of law necessary for their
information in giving their verdict." ORCP 59 B.[7] "A party is
entitled to have the jury instructed on the law that supports
that party's theory of the case when (1) there is evidence to
support that theory and (2) the requested instruction is a
correct statement of the law." *State v. Wan*, 251 Or App 74,
80, 281 P3d 662 (2012). However, a trial court does not err
in refusing to give a proposed instruction—even if legally
correct—if the substance of the requested instruction is
"covered fully by other jury instructions given by the trial
court" or if the requested instruction is "not necessary * * *
to explain the particular issue or point of law to the jury."
*Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d
147 (1998); *see also State v. Tucker*, 315 Or 321, 332, 845 P2d
904 (1993) ("It is not error for a trial court to refuse to give
a requested instruction if the instruction given by the court,
although not in the form requested, adequately covers the
subject of the requested instruction."); *State v. Montez*, 309
Or 564, 600, 789 P2d 1352 (1990) (the trial court did not err
when it refused to give a requested instruction that "added
nothing to the instructions given by the trial court"); *State
v. Cody*, 116 Or 509, 520-21, 241 P 983 (1925) ("The court is

---

[7] ORS 136.330(1) makes ORCP 59 B applicable to criminal trials.

not required to give requested instructions in the language asked, although the law is correctly stated therein. The judge should instruct the jury fairly and impartially regarding the theory of both parties when there is any evidence justifying him so to do. He may do this in his own language and order.").

In addition to the duty to instruct on applicable principles of law raised by the evidence, a trial court also has a duty to refrain from instructing the jury on irrelevant matters, or those that may have the effect of confusing the jury. *See Williams et al. v. Portland Gen. Elec.*, 195 Or 597, 610, 247 P2d 494 (1952) ("The objective of the mold, framework and language of instructions should be to enlighten and to acquaint the jury with the applicable law. Everything which is reasonably capable of confusing or misleading the jury should be avoided."); *see also State v. Stoneberg*, 15 Or App 601, 605, 517 P2d 333 (1973) (affirming the trial court's refusal to give unnecessarily complex and confusing jury instructions).

On appeal, the state does not take issue with defendant's entitlement to have the jury instructed on the applicable legal principles governing self-defense. Rather, the issue reduces to whether the trial court erred by declining to instruct the jury using defendant's modified version of UCrJI 1108. We conclude that it did not.

First, the uniform instruction that the court gave accurately covered the subject matter. An individual's right to self-defense is governed by ORS 161.209, which states, in part, that "a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose." The right to use deadly physical force is limited by ORS 161.219, which states, in relevant part, that a person is not justified in using deadly physical force in self-defense unless he reasonably believes that the other person is either (1) committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person, or (2) using or about to use

unlawful deadly physical force against a person. The uniform jury instructions given by the trial court in this case closely tracked the relevant statutory language, and thus, correctly described the applicable principles of self-defense. *See generally State v. Keffer*, 3 Or App 57, 60, 471 P2d 438 (1970) ("As a general rule it is not erroneous for the court to instruct the jury by defining the crime in the language of the statute if the jury is not confused or misled thereby."). Moreover, defendant identifies nothing in the instructions, arguments, or evidence suggesting that the jury would be inclined to think—erroneously—that there was a duty to retreat, or that defendant's "introduction" of a firearm into the conflict somehow nullified his claim of self-defense, or that the jury would be confused about how to properly evaluate whether defendant "reasonably believe[d]" that use of force was necessary.[8]

Second, certain aspects of defendant's requested instruction risked confusing the jury. Specifically, we take issue with the portion of defendant's proposed instruction that reads, "Even if you find that the introduction of a firearm by defendant into the altercation unwise, that act does not deprive defendant of the right to claim self-defense as to those matters which occur subsequently." Defendant's instruction is phrased in language taken from our opinion in *State v. Burns*, 15 Or App 552, 516 P2d 748 (1973). In that case, we considered whether the trial court's refusal to instruct the jury on the law of self-defense was error. The state had argued that the defendant was not entitled to any jury instruction on self-defense because he had "introduced the firearm into the conflict and was thus the aggressor." *Id.* at 562. We disagreed, explaining:

> "The defendant's act of producing the firearm and threatening to use it, on the one hand, and his actually using it, are separate acts with distinct legal significance. * * *

---

[8] Defendant contends that a statement made by the prosecutor during closing arguments raised questions as to whether defendant had a "duty to retreat" prior to using deadly force. That statement noted both parties' failure to de-escalate the conflict, and specifically, defendant's failure to move away from the victim's wife when asked. We, however, are not persuaded that the prosecutor's remark, made in reference to events leading up to the fight in question, interjected the issue of whether there existed a "duty to retreat" in the altercation that followed.

Deadly physical force was not used until defendant actually fired the gun, and the justification for that action must be assessed in light of the circumstances at the precise moment in which defendant acted. While the introduction of a firearm into the altercation may have been unwise, that act does not deprive a person of the right to claim self-defense as to those matters which occur subsequently."

*Id.*

Although defendant's quote from *Burns* is accurate, it does not follow that the trial court was required to instruct the jury using language from that opinion. *See State v. Nefstad*, 309 Or 523, 551, 789 P2d 1326 (1990) (concluding that it would be "poor logic" if "every quote from every opinion should become a required jury instruction"). The state points out, and we agree, that, without additional clarification, defendant's proposed jury instruction likely raises more questions than answers. Does the phrase "introduction of a firearm" refer to defendant's possession, reference to, threatened use of, or actual use of his handgun? What is the legal significance of the term "unwise"? Taken out of context, defendant's proposed instruction could have distracted the jury from its duty to decide whether defendant acted reasonably at the moment that he *fired* the gun. *See Burns*, 15 Or App at 562 (a defendant's justification for using deadly physical force "must be assessed in light of the circumstances at the precise moment in which defendant acted").

Accordingly, the trial court did not err when it declined to give defendant's requested instruction.

Affirmed.