Argued and submitted February 27, reversed and remanded May 29, 2002

# STATE OF OREGON,
*Appellant,*

*v.*

# SCOTT ALAN WARNER,
*Respondent.*

## 990544488; A108124

47 P3d 497

Laura S. Anderson, Assistant Attorney General, argued the cause for appellant. With her on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Irene B. Taylor, Deputy Public Defender, argued the cause for respondent. With her on the brief was David E. Groom, Acting Executive Director.

Before Landau, Presiding Judge, and Brewer, Judge, and Osborne, Judge pro tempore.

BREWER, J.

**BREWER, J.**

The state assigns error to two pretrial orders suppressing evidence against defendant, who was charged with driving under the influence of intoxicants (DUII). ORS 813.010. Defendant cross-assigns error to the trial court's denial of his motion to suppress the results of a horizontal gaze nystagmus (HGN) test administered to him while he was in the hospital. We review the trial court's legal conclusions for errors of law, *State v. Komas*, 170 Or App 468, 472, 13 P3d 157 (2000), and reverse.

The following facts are taken from the evidence presented at a pretrial omnibus hearing. On May 7, 1999, defendant was the driver of a pickup involved in a traffic accident on the I-205 freeway near the Portland airport. Defendant was injured in the accident and was transported by ambulance to a hospital in Vancouver, Washington. Officer Sorenson was dispatched to investigate the accident, and he went to the hospital to meet defendant. When he arrived at the hospital, Sorenson spoke briefly with the ambulance personnel who had transported defendant, and they informed him that they had smelled alcohol on defendant's breath. Sorenson went into the emergency room and approached defendant, who was lying on his back and strapped to a backboard to keep his head immobilized.

Sorenson engaged in a brief conversation with defendant. During the conversation, Sorenson smelled an odor of alcohol and observed that defendant's eyes were bloodshot and glassy. Sorenson also testified that defendant's speech was slurred when he responded to questions. After approximately five minutes, Sorenson asked for, and received, defendant's consent to perform an HGN test on defendant. Based on the results of the HGN, Sorenson concluded that defendant showed signs of impairment.

Sorenson then questioned defendant specifically about the accident. Defendant told Sorenson that he was going to the airport. He said that he was in the far left lane on I-205 when he realized that he was at the airport exit. While attempting to cut across traffic to take the exit, he hit another vehicle and lost control of his pickup. Defendant's vehicle

struck a cement retaining wall and ended up "on all fours" facing down the ramp at the exit. When Sorenson asked defendant if he had been drinking, defendant responded that he had consumed two or three drinks between 5:00 p.m. and 6:00 p.m. that evening and that he had eaten nothing since lunch. At that point, almost 8:00 p.m., Sorenson placed defendant under arrest for DUII. Sorenson read an implied consent form to defendant, and defendant consented to a blood test.

Before trial, defendant moved to suppress all evidence of the HGN test on the ground that its admission would violate Article I, section 9, of the Oregon Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution.[1] Defendant also moved, pursuant to Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution, to suppress the statements he made to Sorenson after the HGN test was administered.[2] At the conclusion of the omnibus hearing on defendant's motions, the trial court denied the motion to suppress the HGN results but suppressed the challenged statements on the ground that defendant was in custody when Sorenson asked him about the accident without first giving him *Miranda*-type warnings.

---

[1] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] Article I, section 12, of the Oregon Constitution, provides that "[n]o person shall be put in jeopardy twice for the same [offense,] nor be compelled in any criminal prosecution to testify against himself." The Fifth Amendment to the United States Constitution provides that "[n]o person shall * * * be compelled in any criminal case to be a witness against himself * * *."

Following those rulings, defense counsel raised an additional issue regarding evidence obtained as a result of the blood draw:

"I believe the state is going to try to introduce evidence of a blood draw. And it's our opinion that they are going to have some problems doing that. The reason is ORS 813.[160(2)] says that blood tests must be conducted by a duly licensed physician or else a person acting under the direction of such physician. I don't think the state is going to be able to meet their burden imposed by this to show that the person who drew the blood was a duly licensed physician."

The prosecutor responded that ORS 136.432 mandated that the blood-draw evidence be admitted even if it was obtained in violation of ORS 813.160(2).[3]

The court ruled that ORS 136.432 did not apply and that, if defendant's blood was drawn in violation of ORS 813.160(2), the results of the blood test would not be admitted. In lieu of recalling Sorenson to testify regarding compliance with ORS 813.160(2), the parties stipulated that Sorenson would testify as follows:

"Sorenson went to an emergency room where [defendant] was on a back board; that he spoke with and observed the lab tech who had a name tag on his coat. The lab tech was dressed appropriately. When asked, the lab tech gave his title as lab tech and a name that matched the name on the tag that the officer observed. That name being Don Joling * * * .

"The officer asked another person in the emergency [room] if he was the attending physician. The other person said affirmatively that he was the attending physician and gave his name as Dr. Stark; that the officer observed the blood draw; that the officer observed and asked whether [an] iodine swab was being used. He observed the package. He observed the blood draw itself. He observed that the blood was placed in a gray stopper tube and that he from there took custody of the stopper tube."

Defense counsel argued that, based merely on the stipulated facts, the court could not confirm that the person who drew the blood was a duly licensed physician or was acting under

---

[3] ORS 136.432 and ORS 813.160(2) are set out in full below.

the supervision of a duly licensed physician, as required by the statute. The court agreed and concluded that "[t]he officer's testimony wouldn't suffice to get you past the requirements of that statute."

■ On appeal, the state assigns error to the suppression of defendant's statements made after the HGN test was administered and to the suppression of the blood-draw evidence.[4]

We first address the suppression of defendant's statements. The state argues that defendant was neither "in custody" nor were there "compelling circumstances" when Sorenson elicited the challenged statements. Therefore, according to the state, *Miranda*-type warnings were not required under the Oregon Constitution. Further, the state argues that defendant was not subject to "custodial interrogation" when he made the statements; thus, *Miranda* warnings were not required under the United States Constitution. Defendant responds that (1) the trial court found *as a matter of fact* that defendant was "in custody" at the time of the continued questioning; (2) because facts will be construed in favor of the party who won below, *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), this court is bound by that conclusion; and (3) the facts demonstrate that defendant was in "compelling circumstances" after the HGN was administered.

■■ Here, the relevant facts are not disputed, and—contrary to defendant's position—we review the trial court's conclusion for *errors of law*. *See State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (reviewing questions of custody and compelling circumstances for errors of law); *State v. Werowinski*, 179 Or App 522, 529, 40 P3d 545 (2002). "*Miranda* warnings

---

[4] Defendant cross-assigns error to the court's ruling that the HGN test result is admissible. We do not address defendant's cross-assignment of error because he is requesting reversal or modification of a trial court ruling on the admissibility of the HGN test results. Defendant's argument properly should have been raised by a cross-appeal. ORAP 5.57(2); *see Tifft v. Stevens*, 162 Or App 62, 66, 987 P2d 1 (1999), *rev den* 330 Or 331 (2000) (cross-assignment of error may not seek to reverse or modify a judgment on appeal); *State v. Plummer*, 134 Or App 438, 441, 895 P2d 1384 (1995) (declining to consider the defendant's cross-assignment of error to the trial court's failure to suppress evidence on the state's appeal from the trial court's suppression of other evidence, because the defendant should have raised that issue by a cross-appeal).

against self-incrimination are required under the Oregon Constitution when a defendant is in full custody or 'when circumstances exist which, although they do not rise to the level of full custody, create a setting that is "compelling." ' " *Id.* at 526 (quoting *State v. Widerstrom*, 109 Or App 18, 21, 818 P2d 934, *rev den* 312 Or 526 (1991)). In *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987), the Oregon Supreme Court described the concept of "full custody," for purposes of Article I, section 12, in this way:

> "The concept obviously includes extended official detention in a cell or another enclosure, with or without booking or deprivation of personal belongings. But an enclosure is not essential; one would hardly dispute that a person handcuffed on the street or in his own home is in 'full custody.' "

A person is in full custody when he or she is either (1) placed under formal arrest or (2) placed under restraints by police acting in their official capacity. *See Magee*, 304 Or at 265 (full custody exists when restraint or detention is "official"). The Oregon constitutional test is comparable to the test for determining whether a person is in custody for Fifth Amendment purposes, and Oregon courts have approached the two questions using the same analysis. *See State v. Zelinka*, 130 Or App 464, 475, 882 P2d 624 (1994), *rev den* 320 Or 508 (1995) (using same standard to determine whether a person is in "custody" for federal constitutional purposes as for state constitution); *State v. Brown*, 100 Or App 204, 211, 785 P2d 790, *rev den* 309 Or 698 (1990).

■ The only evidence offered at the pretrial hearing was Sorenson's testimony. He testified that he placed defendant under formal arrest only after conducting the HGN test *and* receiving responses to his subsequent questions. Although defendant's movements were restrained, in that he was strapped to the backboard, there is no evidence suggesting that he was placed or kept in that restraint by the police. We therefore conclude that the trial court erred when it determined that defendant was in custody under Article I, section 12, or the Fifth Amendment when Sorenson elicited the challenged statements.

Whether the circumstances nonetheless were sufficiently compelling to require the administration of *Miranda*-type warnings poses a different question. The relevant inquiry is whether "a reasonable person in the suspect's position would have understood the situation" to be compelling. *State v. Clem*, 136 Or App 37, 42, 900 P2d 1064 (1995). "We examine all the circumstances in which the purportedly compelled statements were made" to determine whether warnings were required. *Werowinski*, 179 Or App at 529; *see also State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997).

Defendant asserts that the following facts demonstrate that he was questioned under compelling circumstances: He had just been involved in an automobile accident that left him injured to the extent that he needed to be transported to the hospital. Medical personnel were sufficiently concerned about his injuries to strap him to a backboard to immobilize his neck. Defendant was not free to leave. Furthermore, the fact that Sorenson could not recall whether defendant was injured might indicate that Sorenson "was insisting on getting what information he could from * * * defendant to the extent that he was unaware of any effort to protest or not cooperate by defendant."

We disagree that those circumstances were compelling. First, the mere fact that police questioning takes place in a hospital does not transform the setting into one that is "compelling." *See State v. Foster*, 303 Or 518, 528, 739 P2d 1032 (1987) ("We observe that the location of the two interviews, a hospital, was not a coercive environment."); *see also State ex rel Juv. Dept. v. Newell*, 174 Or App 140, 145, 25 P3d 382 (2001). Second, although defendant was not able to end the conversation with Sorenson by leaving the room, that fact alone is not dispositive. *See, e.g., State v. Soen*, 132 Or App 377, 385, 888 P2d 583, *rev den* 321 Or 47 (1995); *State v. Nevel*, 126 Or App 270, 276, 868 P2d 1338 (1994); *State v. Greason*, 106 Or App 529, 533, 809 P2d 695, *rev den* 311 Or 643 (1991). In particular, here, defendant's inability to leave was not the product of police conduct; rather, he had been immobilized by medical personnel for medical reasons. *See Smith*, 310 Or at 9 (holding that compelling circumstances did not exist where source of the defendant's inability to leave treatment facility was not police conduct but, rather, because

leaving might violate the defendant's probation). Third, there is no evidence in the record that defendant was coerced or pressured to answer the officer's questions, that his medical condition made him more vulnerable to police questioning, or that defendant wished to avoid talking to the officer. In short, the evidence does not demonstrate that defendant was subject to compelling circumstances when he made his post-HGN statements. It follows that the trial court erred in suppressing those statements.

In its second assignment of error, the state asserts that the trial court improperly suppressed evidence obtained from the blood drawn with defendant's consent. The state argues that the blood evidence was obtained in compliance with ORS 813.160(2) and, in the alternative, that ORS 136.432 requires admission of the evidence even if defendant's blood was drawn in violation of ORS 813.160(2). We consider each argument in turn.

ORS 813.160(2) provides:

> "In conducting a chemical test of the blood, only a duly licensed physician or a person acting under the direction or control of a duly licensed physician may withdraw blood or pierce human tissue. A licensed physician, or a qualified person acting under the direction or control of a duly licensed physician, shall not be held civilly liable for withdrawing any bodily substance, in a medically acceptable manner, at the request of a peace officer."

Defendant notes that the stipulated facts—the only facts in the record concerning the blood draw—do not indicate *who* drew defendant's blood. Because that fact is missing, defendant argues, there is no evidence that the blood was drawn by a "duly licensed physician or a person acting under the direction or control of a duly licensed physician."

The language of the stipulation demonstrates that defendant is correct. The stipulation stated that Sorenson spoke with a "lab tech" who was "dressed appropriately," and who "gave his title as lab tech and a name that matched the name on the tag that the officer observed." The stipulation also stated that Sorenson spoke with another person in the emergency room who identified himself as "the attending physician and gave his name as Dr. Stark," and that

Sorenson "observed the blood draw * * * and asked whether [an] iodine swab was being used." Finally, the stipulation provided that Sorenson could establish a chain of custody for the tube that contained the drawn blood. Missing from the stipulation, however, is any mention of *who* drew the blood. Because an inferential leap akin to speculation would be required to determine that the blood was drawn in compliance with ORS 813.160(2), there is insufficient evidence to warrant such a conclusion. *See State v. Piazza,* 170 Or App 628, 632, 13 P3d 567 (2000) (stacking inferences to the point of speculation is impermissible).

The state's alternative argument is that ORS 136.432 requires admission of the blood-draw evidence regardless of whether the procedure complied with ORS 813.160(2). Defendant responds that "ORS 813.160(2) is a statute of limited admissibility. Failure to comply with the statute precludes admission of the blood test results."

ORS 136.432 provides:

"A court may not exclude relevant and *otherwise admissible* evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press." (Emphasis added.)

Defendant does not contend that exclusion of the blood-draw evidence is required by the United States or Oregon constitutions, the rules of evidence governing privileges and the admission of hearsay, or the rights of the press. Instead, he asserts only that the evidence was not "otherwise admissible evidence."

ORS 136.432 was not intended to supplant other evidentiary statutes. Rather, it "simply constrains the courts from creating rules of exclusion where the legislature itself has not created them * * *." *State v. Thompson-Seed,* 162 Or App 483, 489, 986 P2d 732 (1999). Thus, ORS 136.432 does

not allow courts to suppress evidence whose sole taint is that it was obtained in violation of a statutory provision. *See id.* The question therefore is whether ORS 813.160(2) itself operates as a foundational requirement for admissibility, so that failure to comply with its strictures would make any evidence obtained as a result *not* "otherwise admissible." If the statute merely directs police how to obtain a blood test and does not require exclusion of evidence obtained in violation of its dictates, ORS 136.432 would require admission of such evidence.

■■ Because the problem is one of statutory interpretation, we begin by examining the text and context of ORS 813.160. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). ORS 813.160 provides the requirements for using blood alcohol test results in legal proceedings:

"(1) To be valid under ORS 813.300:

"(a) Chemical analyses of a person's blood shall be performed by an individual shown to be qualified to perform such analyses and shall be performed according to methods approved by the Department of Human Services. For purposes of this paragraph, the Department of Human Services shall approve methods of performing chemical analyses of a person's blood that are satisfactory for determining alcoholic content.

"(b) Chemical analyses of a person's breath shall be performed by an individual possessing a valid permit to perform such analyses issued by the Department of State Police and shall be performed according to methods approved by the Department of State Police. For purposes of this paragraph, the Department of State Police shall do all of the following:

"(A) Approve methods of performing chemical analyses of a person's breath.

"(B) Prepare manuals and conduct courses throughout the state for the training of police officers in chemical analyses of a person's breath, which courses shall include, but are not limited to, approved methods of chemical analyses, use of approved equipment and interpretation of test results together with a written examination on these subjects.

"(C) Test and certify the accuracy of equipment to be used by police officers for chemical analyses of a person's breath before regular use of such equipment and periodically thereafter at intervals of not more than 90 days. Tests and certification required by this subparagraph shall be conducted by trained technicians. Certification under this subparagraph does not require a signed document.

"(D) Ascertain the qualifications and competence of individuals to conduct such analyses in accordance with one or more methods approved by the department.

"(E) Issue permits to individuals according to their qualifications. Permits shall be issued to police officers only upon satisfactory completion of the prescribed training course and written examination. A permit shall state the methods and equipment which the police officer is qualified to use. Permits shall be subject to termination or revocation at the discretion of the Department of State Police.

"(2) In conducting a chemical test of the blood, only a duly licensed physician or a person acting under the direction or control of a duly licensed physician may withdraw blood or pierce human tissue. A licensed physician, or a qualified person acting under the direction or control of a duly licensed physician, shall not be held civilly liable for withdrawing any bodily substance, in a medically acceptable manner, at the request of a peace officer.

"(3) An individual who performs a chemical analysis of breath or blood under ORS 813.100 or 813.140 shall prepare and sign a written report of the findings of the test which shall include the identification of the police officer upon whose request the test was administered.

"(4) Any individual having custody of the report mentioned in subsection (3) of this section shall, upon request of the person tested, furnish that person or that person's attorney, a copy of the report.

"(5) The expense of conducting a chemical test as provided by ORS 813.100 or 813.140 shall be paid by the governmental unit on whose equipment the test is conducted or by the governmental unit upon whose request the test was administered if no governmental unit's equipment is used to conduct the test."

Defendant argues that "[t]he plain meaning of the words used in ORS 813.160(2) specifically limit who can draw blood." He relies on *State v. Stover*, 14 Or App 559, 513 P2d 537 (1973), *rev'd on other grounds* 271 Or 132, 531 P2d 258 (1975), where this court construed the statutory predecessor to ORS 813.160(2).[5] According to defendant, "[t]he court in *Stover* held that the purpose of the statute was to insure that only persons who ·were medically trained and competent would withdraw blood for chemical testing in DUII prosecutions." Defendant's argument misses the point of the present inquiry. We agree that the purpose of ORS 813.160(2)—and its predecessor statutes—is to limit the class of persons who may draw blood for purposes of conducting a chemical test to duly licensed physicians or persons acting under the control of a duly licensed physician. However, ORS 813.160(2) does not—either on its face, or in its statutory context—provide for the exclusion of evidence obtained when its requirements are violated.

The legislature knows how to provide foundational requirements when it wishes to do so. *See State v. Chipman*, 176 Or App 284, 294, 31 P3d 478 (2001) (using the "[t]o be valid" language of ORS 813.160(1) as an example of an explicit foundational requirement). Although the legislature placed a foundational requirement—*i.e.*, "to be valid"—in subsection (1), subsection (2) does not contain any similar foundational requirement. *See Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 382, 8 P3d 200 (2000) (recognizing that the legislature's use of a term in one section of a statute and not in another section indicates a purposeful omission); *State ex rel Juv. Dept. v. Tyree*, 177 Or App 187, 193, 33 P3d 729 (2001). The first sentence of ORS 813.160(2) merely prescribes the qualifications for a person withdrawing blood; it does not specify any consequences for failure to comply with its requirements. Likewise, the second sentence, releasing physicians and those who draw blood under physician supervision from civil liability, does not bear on the validity, reliability, relevance, or authenticity of a blood test.

---

[5] *Former* ORS 483.640 (1973), *renumbered as former* ORS 487.825 (1975), *repealed by* Oregon Laws 1983, chapter 338, section 978, provided that, "[i]n conducting a chemical test of the blood, only a duly licensed physician or a person acting under his direction or control may withdraw blood or pierce human tissues."

Moreover, the other subsections of ORS 813.160 cannot be understood to incorporate the "to be valid" language of subsection (1). Subsection (5), for example, provides that the expense of conducting a blood test shall be borne by the governmental unit whose equipment is used to conduct the test. If the "to be valid" language of subsection (1) applied as a foundational requirement for subsection (5), a criminal defendant could compel the exclusion of chemical blood test evidence merely because the state failed to demonstrate that the expense of the test was paid by the proper governmental unit. It makes little sense to assume that the legislature intended such a result.

In sum, the only language within ORS 813.160 that suggests an exclusionary effect is the "to be valid" language contained in subsection (1), and there is nothing in the text or context of the remaining subsections of ORS 813.160 indicating that such a restriction applies beyond subsection (1). Accordingly, we conclude that—despite the insufficient foundation in this case to show compliance with ORS 813.160(2)—the blood draw evidence is "otherwise admissible," and ORS 136.432 requires its admission.[6]

Reversed and remanded.

---

[6] Although it is not necessary to extend the inquiry so far, we note that nothing in the legislative history of subsection (2) indicates a contrary legislative intent. *Cf. Chipman,* 176 Or App at 294-96 (reviewing legislative history of ORS 813.131(4) (1997) and concluding that, although the statute did not "on its face provide for the exclusion of evidence" obtained in violation of the statute, it "implicitly" created a rule of exclusion).