## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 47698

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **Boise, November 2021 Term** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Opinion Filed: May 20, 2022** |
| | ) | |
| **v.** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **TYLER SHAWN CLAPP,** | ) | **SUBSTITUTE OPINION, THE** |
| | ) | **COURT'S PRIOR OPINION DATED** |
| **Defendant-Appellant.** | ) | **FEBRUARY 4, 2022, IS** |
| | ) | **WITHDRAWN** |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Melissa Moody, District Judge.

The judgment of conviction is <u>vacated,</u> and the case is <u>remanded</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant Tyler Shawn Clapp. Brian R. Dickson argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho. Mark W. Olson argued.

_____

STEGNER, Justice.

Tyler Clapp appeals his conviction for driving under the influence. After stopping Clapp for "spinning cookies" in a parking lot, police became suspicious that Clapp was intoxicated. Clapp refused to submit to any field sobriety tests. Police then obtained a warrant for a blood draw, which showed that Clapp's blood alcohol content ("BAC") was 0.152 several hours after initially detaining him.

At trial, the State sought to introduce the results of the blood draw. Over Clapp's objection, the district court allowed the nurse who conducted the blood draw to testify telephonically to his qualifications in order to lay sufficient foundation to admit the results of the blood draw. The results of the blood draw were ultimately admitted, and the jury convicted Clapp of driving under the influence. Clapp timely appealed. For the reasons discussed below, we vacate Clapp's conviction and remand the case for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. At approximately 10:20 p.m. on July 6, 2018, officers from the Boise Police Department witnessed a small pickup truck "spinning cookies"[1] in the parking lot of the Ace Hardware located at Fairview Avenue and Five Mile Road in Boise. The officers stopped the vehicle and found three men in the cab of the truck. Clapp was driving.

Sergeant Smith, one of the two officers on the scene, could smell alcohol emanating from inside of the truck but could not identify from whom the odor was coming. Clapp admitted to drinking two 24-ounce beers earlier that evening, as well as part of an open 32-ounce Miller High Life that was inside the pickup truck. Smith called for reinforcement, and a third officer—Officer Grover—arrived on the scene to assist the investigation.

Grover asked Clapp standard investigatory questions, such as whether he had taken any medication or consumed any alcohol. Grover then asked Clapp to submit to field sobriety testing, which Clapp refused. Grover then "took [Clapp] into custody, handcuffed him[,] and informed him he was under arrest." Grover placed Clapp in his patrol vehicle and transported him to the Ada County Jail.

Grover then obtained a telephonic warrant to draw Clapp's blood to test it for alcohol content. Nathan Wallin, a phlebotomist employed by 24/7 Pro Solutions, drew Clapp's blood and handed the sample over to Grover, who packaged it for testing. Testing revealed that Clapp's BAC was 0.152.

On July 9, 2018, the State filed a Complaint against Clapp, charging Clapp with driving under the influence of alcohol ("DUI," Count I) and possessing an open container of beer while operating a motor vehicle (Count II). Several days later, on July 20, 2018, the State filed an Amended Complaint, which specified it was charging Clapp with a DUI based on two alternative theories: the State asserted that Clapp either drove a motor vehicle while under the influence of alcohol, the impairment theory, "or, in the alternative" drove a motor vehicle "with an alcohol concentration of .08 or more, to-wit: .152 as shown by an analysis of his blood," the *per se* theory. On August 14, 2018, the State filed an Information against Clapp, which alleged the same Count

---

[1] At trial, Sergeant Smith explained that "spinning cookies" is a "common term" used to describe a vehicle "accelerating quickly and turning sharply" while the driver is "not in full control of the vehicle."

I and Count II as the Amended Complaint. Clapp pleaded not guilty to both the DUI count and the open container count.

Before trial, Clapp moved to suppress the blood test results, arguing in part that his blood had been drawn in violation of Idaho Code section 18-8003(1) because Grover, who is not a phlebotomist, could be seen on a body-camera video mixing the blood sample by turning the test tube upside down. Section 18-8003(1) provides that

> [o]nly a licensed physician, qualified medical technologist, registered nurse, phlebotomist trained in a licensed hospital or educational institution or other medical personnel trained in a licensed hospital or educational institution to withdraw blood can, at the order or request of a peace officer, withdraw blood for the purpose of determining the content of alcohol, drugs or other intoxicating substances therein.

I.C. § 18-8003(1). The State responded, arguing that the actual drawing of Clapp's blood had been done by Wallin, a phlebotomist, not by Officer Grover, and suppression was a remedy for a constitutional violation not a statutory violation. The State further argued that Clapp's suppression motion was untimely. The district court denied Clapp's motion to suppress the blood test results, both because the motion was untimely and because it failed on its merits. Clapp moved for the district court to reconsider its ruling on his motion to suppress. The district court granted Clapp leave to supplement his motion to reconsider with an accompanying memorandum, but Clapp did not file one, and the district court never reconsidered the suppression motion.

On November 9, 2018, the State filed an Information Part II, alleging that Clapp had been convicted of three prior felonies, which would, if proven, subject him to a persistent violator sentencing enhancement. Then, on March 14, 2019, the State filed a notice of intent to introduce the expert testimony of John Garner, a forensic scientist employed by the Idaho State Police Forensic Services, regarding the blood test results. In response, Clapp filed a motion in limine to exclude Garner's expert testimony, arguing that the State had failed to disclose Garner's written opinion. The district court denied Clapp's motion and allowed the State to call Garner at trial.

A jury trial took place in June 2019. The State had originally listed Nathan Wallin, the phlebotomist who drew Clapp's blood, as a potential witness. However, the morning of trial, the State advised the district court it only intended to call three witnesses: Sergeant Smith, Officer Grover, and Garner. In its opening statement, the State told the jury that Garner would testify that "he tested [Clapp's] blood sample, and the blood sample, [Clapp's] blood, was .152, over the legal

3

limit." The State sought to introduce the blood test results through Garner, asking Garner to discuss the results of the blood test when he was on the stand.

Clapp objected, arguing that the blood test results lacked foundation.[2] Clapp argued, under Idaho Code section 18-8003(1), the State was required to show that Wallin was qualified to draw blood in connection with DUI cases prior to the blood test results being admitted. Though the district court expressed frustration that Clapp had not raised the issue prior to trial, it agreed that the State was required to show it had complied with Idaho Code section 18-8003(1) to establish the foundation to admit the blood test results. Citing Idaho Rule of Evidence 104, the district court allowed the State to do so outside the presence of the jury; Clapp did not object to this process.

Wallin was out-of-state at the time of trial, so the State called Karen Strop, the owner of 24/7 Pro Solutions, to testify about Wallin's training. Strop testified that Wallin was a licensed practical nurse ("LPN") and that "his experience with phlebotomy and doing blood draws [wa]s extensive." After a brief cross-examination, the State indicated it "ha[d] no follow-up."

The district court noted "[t]he key part that's missing" from Strop's testimony was whether Wallin was "trained in a licensed hospital or educational institution to withdraw blood," and stated it was "on the precipice of excluding the State's evidence." The State was then permitted to ask more questions of Strop, but the district court still found the testimony lacking:

> The testimony that I have heard is that you have to be trained to draw blood to be an LPN. I just feel I'm being extremely technical in reading this, but the statute requires that you have to be trained in a licensed hospital or educational institution to draw blood. We have testimony [from] this witness [that] Mr. Wallin[] was trained in a licensed hospital. We have testimony that as a result of this LPN degree, he was trained to draw blood.
>
> I don't have connecting-the-dots statutory testimony, even though I recognize that it sounds like the death of common sense, but I just don't have it.

The State again questioned Strop in an attempt to establish Wallin's training and the district court agreed to consider the résumé located in Wallin's human resources file at 24/7 Pro Solutions. The district court, however, remained unconvinced, and opted to exclude the blood test results because the State had failed to lay an adequate foundation.

The State then asked if the district court would consider allowing Wallin himself to testify telephonically. Clapp objected to the proposed telephonic testimony, arguing:

---

[2] Clapp also argued that there was a chain of custody issue, an argument not relevant to this appeal because Clapp later withdrew his objection on this issue.

Well, Your Honor, the – for one, the ability to evaluate a witness's credibility and testimony without in-person confrontation is greatly hindered. So we would object to that.

. . .

But – and not having an opportunity to cross-examine him in person, for the [c]ourt to evaluate his testimony in person, we would object to that and believe it to be improper.

After confirming with the State that Wallin was immediately available by telephone, the district court apparently overruled Clapp's objection, stating "[l]et's call him."

Once the State completed its direct examination of Wallin, Clapp declined his opportunity to cross-examine him. The district court asked if the State had any additional questions for Wallin, warning the State that the court would not allow Wallin to be called back. Clapp objected, arguing that because Clapp had not asked Wallin any questions, the State was not entitled to reopen its examination. The district court noted that the rules of evidence did not apply at the hearing and that it would allow the State to ask additional questions. The State asked whether the district court had "any concern with the foundation that [the State] just put forth," to which the judge responded, "Yes, I do." The State again questioned Wallin; afterward, the district court was finally satisfied that "there [wa]s sufficient foundation under [Idaho Code section] 18-8003 with respect to [Wallin's] qualifications" to admit the blood test results.

The jury was then called back, and Garner was allowed to testify that the results of Clapp's blood test showed that Clapp had a BAC of 0.152.

In its closing argument, the State argued two theories to the jury, (1) that Clapp was impaired from alcohol while he was driving (the "impairment theory") and (2) the "easier" theory that his BAC was 0.152, over the legal limit of 0.08 (the "*per se* theory"). During rebuttal, the State conceded that the evidence on its impairment theory "[wa]sn't very strong" and "[wa]sn't overwhelming," but argued that the evidence was "not overwhelming by the choice of the defendant" because he had refused the field sobriety tests. The jury was instructed on both alternative theories.

The jury found Clapp guilty on Count I, driving under the influence. The verdict form did not ask the jury to specify which of the State's two theories under which it found Clapp guilty. The jury additionally found that Clapp had two prior felony DUI convictions, resulting in Clapp being subject to a persistent violator sentencing enhancement. Count II, the open container charge, was dismissed after the State rested; the charge never reached the jury. On January 3, 2020, the

district court entered a judgment of conviction and sentenced Clapp to a unified sentence of 15 years, with five of those years determinate.

Clapp filed his notice of appeal on January 7, 2020. He also filed a motion for a new trial on January 17, 2020, which was denied by the district court on January 24, 2020.

## II.  STANDARD OF REVIEW

> When a violation of a constitutional right is asserted, we will defer to the trial court's factual findings unless those findings are clearly erroneous. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007). This Court exercises "free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *Id.* Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review. *Id.*

*State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015). "Even if evidence was admitted in error, this Court will not grant relief if we find the error to be harmless." *Id.*

"This Court exercises free review over statutory interpretation because it is a question of law." *Saint Alphonsus Reg'l Med. Ctr. v. Raney*, 163 Idaho 342, 345, 413 P.3d 742, 745 (2018).

"This Court reviews a district court's conclusion that evidence is supported by proper foundation under an abuse of discretion standard." *State v. Sheahan*, 139 Idaho 267, 276, 77 P.3d 956, 965 (2003). "Accordingly, this Court uses the four-part *Lunneborg* standard to determine whether the district court '(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.'" *State v. Hess*, 166 Idaho 707, 709, 462 P.3d 1171, 1173 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 873, 421 P.3d 187, 204 (2018)).

## III.  ANALYSIS

On appeal, Clapp argues that the district court's decision to allow Wallin to testify telephonically violated his right to confront the witnesses against him, as set out in the Sixth Amendment of the U.S. Constitution and Idaho Criminal Rule 43.2. The State asserts Clapp's rights were not violated and, even if there were an error, any error was harmless.

### A. The telephonic testimony violated Clapp's right to confrontation.

Citing *Maryland v. Craig*, 497 U.S. 836, 846 (1990) and *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988), Clapp first argues that the district court erred in allowing Wallin to testify telephonically because, even though Wallin was under oath and subject to cross-examination, Wallin was not

6

"physically present" or "observable by the trier of fact" as required by the Confrontation Clause. Clapp acknowledges that the right to confrontation is not absolute but posits that "that right may only be contravened if it 'is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.'" *Craig*, 497 U.S. at 850. The district court did not find there was an important public policy at play here, nor, Clapp asserts, could it have: "the applicable public policy says that, in order to preserve the integrity of the trial process, the parties should properly marshal their evidence in advance of trial," a policy which was "actually undercut" by the admission of Wallin's testimony. Clapp further contends that, while the district court has discretion to allow remote testimony under Idaho Criminal Rule 43.2, any remote testimony it chooses to allow must comport with the procedural requirements of the rule. These procedural requirements, Clapp urges, necessitate a visual component: "the witness must be visible while giving remote testimony."

The State responds that the right to confrontation is a trial right, and the "hearing" at which Wallin testified is "best characterized as a suppression hearing, or a hearing on a motion in limine" rather than part of the trial. Because the "hearing" was not part of the trial, the State argues, the Confrontation Clause did not apply. Additionally, the State asserts that Clapp failed to preserve any arguments under Rule 43.2 because "Clapp never cited this rule during the trial, including in the context of his objection to Wallin's testimony." The State further contends that Rule 43.2 is inapplicable here because it does not prevent telephonic testimony, it simply lays out a procedure for offering forensic testimony by videoconference. Not only was Wallin's testimony not "forensic" in nature, the State urges, the testimony took place outside the presence of the jury, rendering Rule 43.2 irrelevant.

In reply, Clapp argues that the Confrontation Clause is not exclusively limited to trial based on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 315 (2009) and *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (plurality opinion). Clapp also contends that just because the testimony was taken outside of the presence of the jury does not render the "hearing" not part of the trial. Instead, Clapp asserts, Wallin's testimony "was elicited during trial to address a specific trial question – whether the State had laid sufficient foundation to present evidence at trial." Clapp additionally asserts that, though he did not specifically cite Rule 43.2 below, he nonetheless "invoked the language" from the Rule and argued the issue to the district court, thus preserving his argument for appeal. Clapp next contends that Rule 43.2 is applicable here because it establishes an

7

exception to the general rule that remote testimony is not allowed; if the exception is not met, then the general rule prohibiting remote testimony applies, and Wallin's testimony was still admitted in error. Clapp further argues that Wallin did provide "forensic testimony" within the meaning of Rule 43.2 because "the State specifically called [] Wallin in his official capacity as the person who collected the forensic evidence to verify that he was qualified to collect that forensic evidence." Clapp also points to the plain language of Rule 43.2, as well as Idaho Criminal Rules 1 and 2(a), to argue that Rule 43.2 is "not limited to juries."

We need not determine whether Clapp adequately preserved his Rule 43.2 argument because we conclude that the telephonic testimony violated Clapp's right to confrontation under the Sixth Amendment. "The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Craig*, 497 U.S. at 844 (quoting U.S. CONST. amend. VI) (omission in original). The Idaho Constitution "does not contain a confrontation clause similar to that found in the United States Constitution; therefore, this issue is analyzed solely under the United States Constitution." *Stanfield*, 158 Idaho at 332, 347 P.3d at 180.

We first address the State's contention that the Confrontation Clause did not apply because the hearing was not "part of" the trial. We disagree. The State points to *Barber v. Page*, 390 U.S. 719, 725 (1968), in which the United States Supreme Court declared that "[t]he right to confrontation is basically a trial right." 390 U.S. at 725. However, this declaration must be read in context. In *Barber*, the state of Oklahoma argued that a criminal defendant had waived his right to confrontation at trial because he had chosen not to cross-examine that witness at the preliminary hearing. *Id.* The Supreme Court reasoned that, even if the defense had cross-examined the witness at the preliminary hearing, it would have held that the defendant's right to confrontation had been violated:

> The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.

*Id.* As a result, *Barber* does not stand for the proposition attributed to it by the State.

Here, Clapp correctly points out that Wallin's testimony "was elicited during trial to address a specific trial question – whether the State had laid sufficient foundation to present

evidence at trial." As discussed in further detail below, Wallin's testimony was necessary to lay an adequate foundation for the admission of the blood test results, which in turn directly supported the State's *per se* theory at trial. Unlike the testimony from the preliminary hearing in *Barber*, Wallin's testimony went directly to proving the State's case beyond a reasonable doubt at trial. This is further supported by the Supreme Court's more recent decision in *Melendez-Diaz*: "[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." 557 U.S. at 311 n.1. However, "what testimony *is* introduced must (if the defendant objects) be introduced live." *Id.* (italics added). Therefore, we conclude that the Confrontation Clause applied to Wallin's testimony.

We next turn to the issue of whether Clapp's right to confrontation was violated. Though the United States Supreme Court "observed in *Coy v. Iowa* that 'the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact,'" it has "never held [] that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Craig*, 497 U.S. at 844 (quoting *Coy*, 487 U.S. 1012, 1016 (1988)) (italics in original). Rather, the Confrontation Clause "must [] be interpreted in the context of the necessities of trial and the adversary process." *Id.* at 850. Face-to-face confrontation is therefore not "an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Id.* at 849–50.

However, simply because "the face-to-face confrontation requirement is not absolute does not, of course, mean that it may be easily dispensed with." *Id.* at 850. "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial *only* where denial of such confrontation is necessary to further an important public policy and *only* where the reliability of the testimony is otherwise assured." *Id.* (italics added). Both requirements must be met. *Id.*

The United States Supreme Court's analysis in *Craig* is instructive. In *Craig*, the issue was "whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television." *Id.* at 840. At the center of the dispute was a "statutory procedure that permits a judge to receive, by one-way closed circuit television, the testimony of a child witness who is alleged to be a victim of child abuse." *Id.* (footnote omitted).

"To invoke the procedure, the trial judge must first 'determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.'" *Id.* at 840–41 (quoting Md. Code Ann., Cts. & Jud. Proc. § 9–102(a)(1)(ii) (1989)) (alteration in original). "Once the procedure is invoked, the child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom." *Id.* at 841. "The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom." *Id.* "During this time the witness cannot see the defendant." *Id.* "The defendant remains in electronic communication with defense counsel, and objections may be made and ruled on as if the witness were testifying in the courtroom." *Id.* at 842. This procedure was invoked at trial against the defendant in *Craig*, who was subsequently convicted. *Id.* at 843.

Though the "statutory procedure, when invoked, prevents a child witness from seeing the defendant as he or she testifies against the defendant at trial," the United States Supreme Court concluded there was no Confrontation Clause violation. *Id.* at 851–57. The Supreme Court first determined that the reliability of the child witness' testimony was assured even without face-to-face confrontation, because the

> procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.

*Id.* at 851. Therefore, the "critical inquiry" was "whether use of the procedure [wa]s necessary to further an important state interest." *Id.* at 852.

The Court concluded "that a State's interest in the physical and psychological well-being of child abuse victims *may* be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* (italics added). Thus, "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of [the] special procedure[.]" *Id.* Importantly, "[t]he requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the *particular* child witness who seeks to testify." *Id.* (italics added). Because the trial court was required by the statute to determine whether a particular child witness would be subjected to "trauma [that] would impair the child's

10

ability to communicate" if the child were to "testify[] in the physical presence of the defendant" prior to invoking the special procedure, the Supreme Court concluded "a proper finding of necessity ha[d] been made" in *Craig*. *Id.* at 857.

We first note that the reliability of Wallin's telephonic testimony is less assured than the closed-circuit television testimony in *Craig*. It is undisputed that Wallin testified under oath and Clapp had the opportunity to cross-examine Wallin; however, unlike in *Craig*, Wallin was at no point visible to the judge, counsel, or Clapp. Neither the parties nor the judge were able to view or assess Wallin's demeanor as he testified, which is one of the "other elements of confrontation" that "adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851.

The State urges that, because Wallin's testimony was about his own qualifications rather than direct evidence of Clapp's guilt or innocence, the telephonic testimony was adequately reliable. However, as recently noted by the Montana Supreme Court, "nowhere in the text of the Confrontation Clause is there language limiting the type of testimonial evidence to which the right to physical confrontation applies." *State v. Mercier*, 479 P.3d 967, 977 (Mont. 2021). In *Mercier*, the prosecution "presented a foundational witness in real time by two-way videoconference." *Id.* at 972. On appeal, the prosecution argued "that the nature of the testimony—foundational with no substantive force—weigh[ed] in favor of approving the video testimony." *Id.* at 976–77. The Montana Supreme Court disagreed, concluding that the prosecution had failed to demonstrate that the two-way videoconference was necessary to "further[] an important public policy" as is required under the United States Supreme Court's decision in *Craig*. *Id.*

We agree with our sister court: *Craig* makes clear "that although face-to-face confrontation is not an absolute constitutional requirement, it may be abridged *only* where there is a case-specific finding of necessity." *Craig*, 497 U.S. at 857–58 (internal quotations omitted) (italics added). No such finding was made here. The State did not argue any state interest below, let alone one that would necessitate telephonic testimony. The district court overruled Clapp's objection to the telephonic testimony by simply stating, "Let's call him." Therefore, not only was there no case-specific finding of necessity, but there was also no finding of necessity at all. The Confrontation Clause requires more before a defendant's right to face-to-face confrontation may be abrogated.

We further note that, on appeal, the State has not responded to Clapp's argument there is no applicable important state interest here. Instead, the State maintains that Clapp should have

objected to the admission of the blood test results prior to trial. However, the State had originally listed Wallin as a witness and it was not until the morning of trial that the State informed Clapp and the district court it would not be calling Wallin as a witness. Additionally, even if we were persuaded Clapp should have raised foundational issues before trial (which we are not), it is the State's burden to "make[] an adequate showing of necessity[.]" *Id.* at 852. The State has not done so either below or on appeal.

This is not to say there could never be a finding of necessity under similar facts. Certainly, "in certain narrow circumstances, competing interests, if closely examined, may warrant dispensing with confrontation at trial." *Id.* at 848 (internal quotations omitted). However, the Supreme Court declined to adopt a categorical rule that it is always necessary to protect child abuse victims from further trauma and instead required a case-specific finding of necessity. We cannot subvert that requirement under the facts of this case, particularly when the State has not advanced a single public policy.

Based on the above analysis, we conclude that Wallin's telephonic testimony violated Clapp's Sixth Amendment right to confrontation. Therefore, we need not address whether Clapp properly preserved his Rule 43.2 argument or the merits of that argument.

**B. The State has failed to meet its burden establishing harmless error.**

Clapp argues that Wallin's telephonic testimony was "particularly troubling because it was only through [] Wallin's improperly-admitted remote testimony that the State laid sufficient foundation to make the blood test results admissible." Clapp contends that the State's *per se* theory "was the primary focus of the State's argument at closing," which it would not have been able to establish without the results of the blood test. Clapp points specifically to the prosecutor's admission during closing arguments that the evidence on its impairment theory was "relatively weak."

The State contends that any error was harmless "in this case where Wallin took an oath, Clapp was given the opportunity to cross-examine [Wallin], and where the brief testimony was utilized simply as a condition requisite for the admission of other evidence, rather than as substantive evidence to support a guilty verdict." The State argues that, because Wallin's testimony took place outside the presence of the jury, the testimony could not have impacted the jury's final decision. Additionally, the State asserts that it was not required to show that Wallin had the requisite credentials under Idaho Code section 18-8003(1) prior to admitting the blood test results,

12

and, even if it were required to do so, it met that showing through Strop's in-person testimony and Wallin's résumé. As such, the State argues, any error was harmless because the blood test results could have been admitted without Wallin's testimony.

Clapp responds that the district court did not abuse its discretion in determining that neither Strop's testimony nor Wallin's résumé were enough to meet the State's foundational burden. Clapp additionally argues that the State failed to carry its burden on harmlessness because "[t]he record is clear that, without [Wallin's testimony], the State would not have been allowed to present the test results." "[T]here is more than a reasonable probability that the blood test results contributed to the jury's verdict," Clapp claims, "and thus, the error in allowing [] Wallin to testify – the only reason those test results were admitted – was not harmless beyond a reasonable doubt." Though the jury itself did not hear Wallin's testimony, Clapp suggests that it nonetheless "*contributed to the jury's verdict*" because the blood test results never would have been admitted without Wallin's testimony and "the prosecutor[] conce[ded] that the State's evidence on the alternative theory was relatively weak." (Italics in original.)

> When this Court finds an error that was objected to at trial, this Court reviews the error under the harmless error test. *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010). In *Perry*, this Court adopted the harmless error test outlined in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "Under the *Chapman* harmless error analysis, where a constitutional violation occurs at trial, and is followed by a contemporaneous objection, a reversal is necessitated, *unless* the State proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Perry*, 150 Idaho at 221, 245 P.3d at 973 (italics in original) (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. 824).

*State v. Jeske*, 164 Idaho 862, 868, 436 P.3d 683, 689 (2019). "'To say that an error did not contribute to the verdict is [] to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). "The *Yates* Court identified 'two quite distinct steps. First, [a reviewing court] must ask what evidence the jury actually considered in reaching its verdict.'" *Id.* (quoting *Yates*, 500 U.S. at 404) (alterations in original). "Second, the court must 'weigh the probative force of that evidence as against the probative force of the [error] standing alone.'" *Id.* (alterations in original). "Proper application of the *Yates* two-part test requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of

the error." *Id.* "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond a reasonable doubt' without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Id.* (quoting *Yates*, 500 U.S. at 404–05).

Here, it is apparent that the evidence at issue is the blood test results, not merely the foundation for the results, which was Wallin's testimony. As noted by the State, Wallin's testimony occurred outside the presence of the jury and, therefore, the actual content of Wallin's testimony was not heard by the jury. Instead, as the State points out, Wallin's testimony was simply used as a foundational prerequisite for the admission of the blood test results. Indeed, it is apparent from the record that the district court would not have admitted the results of the blood draw without Wallin's testimony: at trial, the State first attempted to show it had complied with Idaho Code section 18-8003(1) through the testimony of Strop. However, on three separate occasions, the district court concluded it "d[id]n't have the connecting-the-dots statutory testimony" to be able to admit the blood test results, even considering Wallin's résumé. After three failed attempts to admit the blood test results through Strop's testimony, the State then offered Wallin's telephonic testimony. The district court allowed the State to question Wallin twice and concluded the State had met its foundational burden only after the second round of questioning.[3]

The State makes two main arguments as to why Wallin's testimony was not necessary for the admission of the blood test results: (1) the State was not required to prove Wallin was qualified to draw blood under Idaho Code section 18-8003(1); and (2) even if the State were required to prove Wallin was qualified to draw blood under Idaho Code section 18-8003(1), the State met that requirement through the testimony of Strop and the district court's consideration of Wallin's résumé.

As to the State's first argument, our analysis of the statute is limited because "'[a]dditional issues raised for the first time on appeal at oral argument are not properly before this Court.'" *State v. Almaraz*, 154 Idaho 584, 598–99, 301 P.3d 242, 256–57 (2013) (quoting *State v. Crowe*, 131 Idaho 109, 111, 952 P.2d 1245, 1247 (1998)) (alteration in original). During its appellate argument, the State asserted that reading a foundational requirement into section 18-8003(1) would raise

---

[3] We also do not condone a process in which the district court found the foundation laid by the State lacking and yet allowed the State to supplement its earlier inadequate testimony through various interrogations until sufficient testimony was apparently elicited that the district court acquiesced and admitted the evidence. The district court allowed the State multiple opportunities to remedy a problem created by the State itself—not subpoenaing Wallin.

14

separation of powers concerns between the judiciary and the legislature. However, at no point below or in its briefing on appeal did the State raise this issue. Because the State first raised the separation of powers issue at oral argument, the issue is not properly before us, and we leave the merits of that issue for another day.

We conclude that the arguments that are properly before this Court regarding section 18-8003(1) are unavailing. The State argues that, under the plain language of Idaho Code section 18-8004(4), "the only foundational requirement for the admission of the results of a blood test for alcohol concentration is that the test be performed by a method approved by the Idaho State Police." This is incorrect. Section 18-8004(4) of the Idaho Code provides that

> [n]otwithstanding any other provision of law or rule of court, the results of any test for alcohol concentrations . . . performed by a laboratory operated or approved by the Idaho state police or by any other method approved by the Idaho state police shall be admissible in any proceeding in this state without the necessity of producing a witness to establish the reliability of the testing procedure for examination.

I.C. § 18-8004(4). Section 18-8004(4) simply eliminates the need for the State to "produc[e] a witness to establish *the reliability of the testing procedure*" in order to lay the foundation for test results. I.C. § 18-8004(4) (italics added). The reliability of scientific evidence is essentially an inquiry into whether the testing process or technique is scientifically valid. *Weeks v. Eastern Idaho Health Services*, 143 Idaho 834, 837–40; 153 P.3d 1180, 1183–86 (2007) (holding the district court erred in excluding expert testimony based "upon sound scientific principles"); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n.9 (1993) ("In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*.") (italics in original).[4] Reliability of the testing technique, however, is not the *only* foundational requirement needed to admit scientific test results; conformity with the test procedure must also be shown. *See, e.g.*, *State v. Longhofer*, 162 Idaho 525, 528, 399 P.3d 852, 855 (Ct. App. 2017).

Additionally, though this Court has not yet had an occasion to consider Idaho Code section 18-8004(4), the Idaho Court of Appeals has done so. *See State v. Bell*, 115 Idaho 36, 764 P.2d 113 (Ct. App. 1988). The Court of Appeals specifically concluded that section 18-8004(4)[5] "does not

---

[4] This Court utilizes Idaho Rule of Evidence 702 rather than the *Daubert* test to analyze admissibility of expert evidence. *Weeks*, 143 Idaho at 838, 153 P.3d at 1184. However, we have "used some of *Daubert's* standards in assessing whether the basis of an expert's opinion is scientifically valid." *Id.*

[5] The version of section 18-8004(4) that the Court of Appeals considered in *Bell* was virtually identical to the version at issue here, except that the entity responsible for determining the approved method for performing a blood test was

wholly eliminate the need of establishing foundational requirements for a test result." *Id.* at 39, 764 P.2d at 116. Rather, "[t]he adoption of the particular test procedure merely recognizes the validity and reliability of that particular accepted test." *Id.* The State has not provided any reason as to why this Court should overturn the Court of Appeals' thirty-three-year-old opinion, and we decline to do so based on the arguments before us.

The State further contends that "nothing in [Idaho Code section] 18-8003(1) speaks to admissibility," and directs this Court to the Oregon Court of Appeals' decision in *State v. Warner*, 47 P.3d 497, 504–05 (Or. Ct. App. 2002). The State's reliance on *Warner* is misplaced. At the time *Warner* was decided, Oregon Revised Statute section 813.160 read in pertinent part:

> (1) To be valid under ORS 813.300 [to be used as evidence in a DUI case]:
>
> > (a) Chemical analyses of a person's blood shall be performed by an individual shown to be qualified to perform such analyses and shall be performed according to methods approved by the Department of Human Services. For purposes of this paragraph, the Department of Human Services shall approve methods of performing chemical analyses of a person's blood that are satisfactory for determining alcoholic content.
> >
> > . . .
> >
> > (2) In conducting a chemical test of the blood, only a duly licensed physician or a person acting under the direction or control of a duly licensed physician may withdraw blood or pierce human tissue. A licensed physician, or a qualified person acting under the direction or control of a duly licensed physician, shall not be held civilly liable for withdrawing any bodily substance, in a medically acceptable manner, at the request of a peace officer.

*Id.* at 504. As the State points out, the *Warner* court concluded that section 813.160(2) of the Oregon Revised Statutes did not establish a foundational requirement. *Id.* at 505. However, the Oregon Court of Appeals reached that conclusion because the first section of the statute, section 813.160(1), specifically provided a list of criteria that must be met for a blood test result "to be valid" as evidence. *Id.* Though section 813.160(2) "limit[s] the class of persons who may draw blood for purposes of conducting a chemical test," it was not listed as a criterion under section 813.160(1) for the evidence "to be valid." *Id.* Therefore, the Oregon Court of Appeals reasoned that the legislature had purposely excluded section 813.160(2) from the foundational requirements listed in section 813.160(1). *Id.*

---

the Idaho Department of Health and Welfare rather than the Idaho State Police. *See Bell*, 115 Idaho at 39, 764 P.2d at 116.

Idaho has no statute that, like Oregon Revised Statute section 813.160(1), provides a checklist of criteria needed for a blood test result "to be valid" and admissible under Idaho law. As discussed above, Idaho Code section 18-8004(4) eliminates the need for the State to independently establish an accepted BAC test procedure's *reliability* in every case it tries but does not provide "the only foundational requirement" for BAC test results to be admitted at trial. Thus, Idaho Code section 18-8003(1) is readily distinguishable from Oregon Revised Statute section 813.160(2), and we are not persuaded by the decision of the Oregon Court of Appeals.

We hold that, under the arguments properly before this Court, the State was required to establish that Wallin was a person qualified to draw blood under section 18-8003(1) prior to admitting the blood test results.

As to the State's second argument, we hold that the State has not shown the district court abused its discretion when it concluded Strop's testimony did not lay sufficient foundation to admit the blood test results. *See Sheahan*, 139 Idaho at 276, 77 P.3d at 965 ("This Court reviews a district court's conclusion that evidence is supported by proper foundation under an abuse of discretion standard."). Though the State argues that it is an "inescapable inference, based upon Strop's testimony and Wallin's résumé," that Wallin was qualified to withdraw blood under section 18-8003(1), the testimony the State points to is less than concrete evidence of Strop's knowledge of Wallin's credentials. The prosecutor asked Strop, "is it fair to say whether or not Mr. Wallin has been trained in a hospital to perform blood draws?" Strop answered, "I would say yes." However, when asked about this answer on cross-examination, Strop clarified: "Well, I would say that any nurse is trained in a hospital because there are a certain number of required hours, clinically, they have to do. . . . [T]hat's just common knowledge that that's - he would have to have had hospital experience to get his nursing license." Strop further testified that she "d[id]n't have access to [Wallin's] clinical training that he endured [sic] to become a nurse." Likewise, Wallin's résumé states that he "managed" and "mentored" others "in training of proper steps of procedures for . . . venipuncture," but it is unclear whether Wallin himself received phlebotomy training in a hospital. Thus, we cannot conclude the district court abused its discretion when, prior to Wallin's testimony, it concluded the State had not met its foundational burden and declined to admit the blood test results.

The State does not contest Clapp's assertion that the blood test results were necessary to secure his conviction. Nowhere in its brief does the State argue that the evidence in front of the

jury was sufficient to obtain a verdict under the "impairment theory" argued at trial, nor does the State argue that, without the blood test results, it could have proven the "*per se* theory" beyond a reasonable doubt. It is the State's burden to prove harmless error and the State has made no argument that, without the blood test results, Clapp would still have been convicted. The State effectively concedes that the blood test results not only contributed to the verdict but were necessary to secure a conviction.

As discussed above, the State has failed to show that Wallin's testimony was unnecessary for the admission of the blood test results. As a result, the State has failed to carry its burden that the erroneous admission of Wallin's telephonic testimony was harmless.

## IV.    CONCLUSION

For the reasons stated above, we vacate Clapp's conviction. The case is remanded for further proceedings consistent with this opinion.

Chief Justice BEVAN, Justices BRODY, MOELLER and ZAHN CONCUR.